WILL OF SLINGER.

*March 6 — June 20, 1888.*

*(1) County court: Jurisdiction: Residence of testator: Guardianship in another county. (2, 3) Wills: Capacity of one under guardianship: Undue influence: Evidence.*

1. A county court having determined that a testator was a resident of the county at the time of his death, and such determination having been sanctioned on appeal to the circuit court both by the jury and the court, this court will not set it aside merely because the testator's property and person had been placed under guardianship in another county, it appearing that such guardianship of his person had been practically abandoned before his death.

2. The mere fact that a person is under guardianship as to his person and property, does not incapacitate him to make a valid will.

3. The evidence in this case,— showing, among other things, that the testator, who was about seventy years old, had been an habitual drunkard for fifty years and that his appetite for drink was uncontrollable and had become a burning passion; that several years prior to his death he had inherited some money, and a guardian of person and property had then been appointed; that he afterwards went to live with his brother, a saloon-keeper, who offered him a home as long as he should live, with full and free opportunity to drink when and what he pleased, and who resisted the efforts of his guardián to take him away; and that the testator had been drinking to some extent on the day that he made his will which made such brother his sole legatee,— is *held* to sustain a finding by the jury of undue influence in the making of the will.

APPEAL from the Circuit Court for *Sauk* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

August 23, 1886, Michael Slinger died at Merrimack, Sauk county, Wis., leaving a paper writing, purporting to be his last will and testament, of which the following is a copy:

"In the name of God, amen. I, Michael Slinger, of the town of Merrimack, in the county of Sauk and state of Wisconsin, of the age of seventy years, and being of sound

mind and memory, do make, publish, and declare this my last will and testament, in manner following, that is to say: *First.* I give and bequeath to my brother, *Tempest Slinger*, the sum of seventeen hundred dollars and ninety-five cents; which said legacy or sum of money I direct and order to be paid to my said brother, *Tempest Slinger*, legatee, within one year after my decease. And, *lastly*, I give and bequeath all the rest, residue, and remainder of my moneys, personal estate, goods, and chattels, of what nature or kind soever, to my said brother, *Tempest Slinger*, whom I hereby appoint sole executor of this my last will and testament, hereby revoking all former wills by me made.

"In witness whereof I have hereunto set my hand and seal this second day of December, in the year of our Lord one thousand eight hundred and eighty-four.

"MICHAEL SLINGER.    [L. S.]"

To this there was annexed an attesting clause, subscribed by three witnesses, as residing at the city of Baraboo, to wit, William Stanley, George Ruland, and William Brown.

August 30, 1886, *Tempest Slinger* petitioned the county court of Sauk county for the probate of the will, and represented therein such death and will, and that the deceased left personal estate to the value of about $2,000; that his heirs were *Ann Calverly*, Mrs. William Curry, Mrs. Joseph Curry, Mrs. Robert Curry, Riley Slinger, Henry Slinger, John Slinger, and Andrew Slinger, all residing in Columbia county, Wisconsin, and Christopher Slinger, Henry Slinger, and Margaret Slinger, residing in England; and that said deceased left no debts except to said petitioner for his maintenance. Said petition was verified before the said William Brown, as notary public, and who also signed the same as "attorney for petitioner." Such proceedings were had thereon that upon the affidavits of said subscribing witnesses, made October 13, 1886, the said county court did on the same day allow and admit said paper writing "to pro-

bate as and for the last will and testament of the said Michael Slinger, deceased."

On or about November 16, 1886, said *Ann Calverly*, sister and heir at law of said deceased, appealed from said order and decree of the said county court to the circuit court for Sauk county, and gave the requisite bond thereon, which was then approved. The said appellant thereupon contested said will and the probate thereof upon several grounds which will appear from the several questions submitted to the jury upon the trial in the form of a special verdict, which, with the several answers of the jury thereto, are to the effect (1) that the deceased, Michael Slinger, did, December 2, 1884, make and execute a last will and testament; (2) that the same was made, signed, witnessed, and executed in due form of law; (3) that previously, and on January 16, 1883, and when the said Michael Slinger was a resident of Columbia county, the county court of that county duly adjudged the said Michael Slinger to be a spendthrift and incompetent to have charge of his estate to manage the same properly, and appointed William B. Currie as his guardian; (4) that said appointment was still in force and unrevoked at the time when said will was executed; (5) that at the time of making said will the said Michael Slinger was residing or domiciled in Sauk county; (6) that he had changed his residence or domicile without the consent of his guardian; (7) that the said Michael Slinger was not of sound, disposing mind, and competent to make his will, at the time of making said will; (8) that at the time of making said will he was under undue and improper influences, which deprived him of his free will.

Thereupon the contestant moved for judgment on the verdict, and that said order of the county court be vacated and probate of said instrument be denied; whereupon the proponent moved to set aside the verdict, and for judgment affirming the order of the county court, notwithstanding

said verdict; and upon the hearing of said motion it was ordered that the motion made upon the part of the appellant be overruled, and the motion made upon the part of the proponent be granted; and it was further ordered that the order of the county court appealed from be wholly affirmed, and that the case be remitted to the county court for further proceedings in pursuance of the opinion of the circuit court as therein recited, and according to law, and that judgment be entered accordingly. From the judgment thereon accordingly the contestant, *Ann Calverly*, appeals.

*W. S. Stroud*, for the appellant.

*William Brown* and *G. J. Cox*, for the respondent.

The following opinion was filed March 27, 1888:

CASSODAY, J. The correctness of the first and second findings of the jury as to the formal execution of the will has not been challenged.

1. The first question that confronts us is as to the jurisdiction of the court. The jurisdiction of a county court extends to the probate of wills of all persons dying testate " who were at the time of their decease inhabitants of or residents in the same county." Sec. 2443, R. S. " If a case be originally within the jurisdiction of the county courts of two or more counties, the court which first takes cognizance thereof by the commencement of proceedings shall retain the same throughout." Sec. 2444, R. S. " The jurisdiction assumed by any county court in any case, so far as it depends on the place of residence of any person, or the location of his estate, shall not be contested in any other action or proceeding whatever, except on an appeal from the county court in the original case, or when the want of jurisdiction appears on the same record." Sec. 2445, R. S. Here, it sufficiently appears that the testator was an inhabitant or resident of Sauk county at the time of his death

to justify the county court therein taking jurisdiction.   Its determination of such fact, giving such jurisdiction, was sanctioned in the circuit court by both the jury and the court.   We do not feel authorized to set aside such determination merely because the testator's property and person had been placed under guardianship in Columbia county, January 16, 1883; but which guardianship, so far as his person was concerned, was practically abandoned April 1, 1885, if not before.   Since such jurisdiction cannot be contested in any other action or proceeding, such determination must be regarded as conclusive.

2. The jury found that the testator was not of sound, disposing mind and competent to make his will at the time of making the will in question.   The mere fact that a testator is, at the time of making his will, under guardianship as to his person and property, may not of itself incapacitate him to make a valid will, provided he is capable, at the time, of comprehending the conditions of his property, his relationship to the natural objects of his bounty, and the disposition actually made of his property by such will.   Under the evidence, we are unwilling to say that the trial court was not justified in holding, in effect, that at the time of making the will in question the testator had such comprehension, and hence mental capacity; so that the seventh finding of the jury, standing alone, might be fairly regarded as unsupported by the evidence.

3. This brings us to the last and most difficult question in the case, and that is whether the jury were justified in finding from the evidence, as they did, in effect, (8) that at the time of making said will the testator was under undue and improper influences, which deprived him of his free will.   This court has held that " undue influence, in such a case, is such an influence that the instrument is not properly an expression of the will of the testator in regard to the disposition of his property, but rather an expression of the

will of another person." *In re Jackman*, 26 Wis. 104.
Manifestly, it is a subtle species of fraud, whereby mastery
is obtained over the mind of the victim by insidious ap-
proaches, seductive artifices, or other species of circumven-
tion.    From the very nature of such influence, the evidence,
generally, is wholly or almost wholly circumstantial.    The
questions to be considered are not confined to the conduct
of the favored legatee and his friends, constituting the al-
leged undue influence, but extend to the susceptibility of
the testator to the peculiar influences brought to bear upon
him, and his capacity to discover and resist such approaches
and importunities.    The previous relations, friendships, and
intercourse between the testator and the several parties
concerned, and the physical and mental conditions of the
testator, therefore, as well as the circumstances under which
the will was executed, are important to be considered.    Upon
these principles, let us consider such susceptibilities and ca-
pacities of the testator as are revealed by this record.    A
mere summary only can be given here.

   The testator, Michael Slinger, was about seventy-two
years of age when he died.    The proponent and sole devisee
and legatee, *Tempest Slinger*, was his brother, and nearly
seven years younger, and at the time of making the will
lived at Merrimack, Sauk county.    They were both born in
England.    Michael married there, and had one daughter.
*Tempest* married there, and had two or three children.
Michael and *Tempest* came to this country together in the
same vessel in the fall of 1844.    Neither brought any of his
family with him.    Michael and *Tempest* both had the same
trade, and Michael worked for *Tempest* for about eleven
years.    They worked together on jobs in this country, seven
or eight years, at Mineral Point, Spring Green, Richland
Center, etc.    Then Michael did jobs for himself at Roxbury,
Lodi, and other places.    When he would get out of work
he would, until more recently, stop and make his home

with *Tempest.* In later years, and for the last ten or fifteen years, he would on such occasions, most of the time, stop and make his home with other brothers, sisters, nephews, and nieces living in Columbia county, as circumstances might suggest. Apparently, neither his wife nor daughter ever came to this country. According to the testimony of *Tempest,* Michael would sometimes, fifty years ago, and while still in England, drink to excess for a week or two, and then quit for three or four months; and this habit of drinking to excess, he says, continued as long as he lived. Over twenty years ago he was exposed to the cold one night, in a state of intoxication, while living at Troy, and froze his feet, and consequently lost all his toes. In this crippled condition, and as years advanced, he seems to have done but little work, and that only at odd intervals. The money acquired by such work appears to have been spent for liquor soon after; and, as he never accumulated any property by his own efforts, he seems to have been for several years prior to 1882 dependent almost wholly on relatives for a living, principally those residing in Columbia county. During these years, and as he grew older, his physical resources gradually seem to have become more debilitated, and his power of self-control and his force of will gradually weakened, while his inveterate appetite for intoxicating liquors seems to have become a burning passion. Whenever he would get a little money, he would go to some saloon, generally the nearest, and there stay until he spent it all, and then get to some of his relatives as best he could, frequently in a state of stupid intoxication. When he was entirely sober and free from the influence of liquor he appears to have been somewhat strong and set in his way; but when he had started on one of his drinking spells it was very difficult to stop him. At times he would beg for liquor, and promise almost anything to get it; and was very easily influenced if he could thereby obtain any liquor.

So uncontrollable was his passion for intoxicants that, when he could get nothing else, he would drink camphor, spirits of nitre, liniment, or anything of that nature, if allowed to remain within his reach.

While in this wretched and destitute condition, and apparently some time in 1882, he suddenly inherited a considerable property, including the $2,000 said to be here involved, by the death of his daughter in England. He was then living with his nephew Stephen Calverly, son of this contestant, at the town of Pacific, Columbia county, Wisconsin. He had been living there, and with Stephen's mother, most of the time for some years before. But during the year he was at *Tempest's* four or five weeks. December 29, 1882, Michael made a previous will, whereby he gave to his brother Christopher Slinger, then and since a resident of England, £100 of English money, in the form of a note for that amount which he had thus acquired and held against him; and all the rest, residue, and remainder of his " personal estate, of what kind or nature soever," he thereby gave to his nephew, Stephen Calverly, Jr., who was therein appointed executor of said will. Thereupon, and upon the petition of said John Slinger, such proceedings were had in the county court for Columbia county (Hon. L. W. BARDEN, county judge, presiding) that Michael was duly adjudged to be a spendthrift, and incompetent to have charge of his estate to manage the same properly; and thereupon, and on January 16, 1883, the said county court for Columbia county appointed William B. Currie, of that county, as guardian of said Michael Slinger, and thereby authorized and empowered him to take and have the custody of his person. and the care and management of his estate, until he should be discharged therefrom according to law. Currie qualified as such guardian, and entered upon the duties of such trust. He was the husband of a niece of Michael's. Michael remained with Stephen most of the time thereafter

until in the month of November, 1884. In August, 1884, Michael's guardian let him have $50.

In November, 1884, Michael expressed a desire to go to his guardian's, who lived in the town of Arlington, Columbia county, and some fifteen miles distant from Stephen's, to get some money, and requested him to take him to the train. Stephen did so, and let him have five dollars, but when he was about returning to his home he discovered that Michael was too much under the influence of liquor to be left alone, and so he took him back to his home with him. Two days afterwards the trip was repeated, but, as soon as they got to Portage, Michael got some liquor to drink, and then declined to go to the train, and so Stephen took him home again. Three days afterwards, Michael asked for more money, and proposed to go to his guardian's alone. Stephen gave him four dollars more, and he got up before daylight on Monday morning, and started off on his own accord; but, instead of going to his guardian's, he seems to have gone directly to the home of *Tempest*, in Merrimack, Sauk county. Just how he came to go there at that time and under such circumstances does not appear. But it may be fairly inferred from his conduct and the testimony of *Tempest* that it was in pursuance of an understanding with, or invitation from, the latter, who testified that three months never passed by, when he was absent, without a letter passing between them. Besides, he says he used to go to see him; and that he had seen him not long before he came at that time,— might have been six or seven months. Just what time in November, 1884, he left Stephen's and went to *Tempest's* is somewhat uncertain from the evidence. Stephen testified it was the Monday before Thanksgiving. This is corroborated by the testimony of *Tempest's* son. *Tempest* swears that he came there in the early part of November, and this is corroborated by another witness. Certain it is that, as soon as he reached *Tempest's* house, all

restraints upon his passion for intoxicants were at once and wholly removed.   *Tempest* kept a saloon, and Michael had free access to it, drinking when he pleased and what he pleased from the first.   *Tempest* testified, in effect, that Michael could go to the bar and drink whenever he was a mind to; that at times he attended the bar; that when he got too much liquor *Tempest* would attend the bar himself.

This sudden change from comparative abstemiousness, under such partial restraint, to the constant temptation of a depraved appetite which had been uncontrollable for several years, with full opportunity for free indulgence, naturally had a controlling influence over the victim, and placed him under special subjection to the man who was expected to continue the debilitating and stupefying supply.   The effect on Michael manifested itself soon after his arrival at *Tempest's* house by his repeated assertions to the effect that he should thereafter make his home with *Tempest* as long as he lived, with remarks reflecting on the treatment of those who had thus kept him under partial restraint, and that he should make his will and give all his property to *Tempest*. The boldness and frequency of these assertions pretty clearly indicate, by implication, a previous invitation and assurance to that effect from *Tempest*.   Such assurances seem to have been emphasized by the action of *Tempest*, prior to the making of the will, in fitting up a room especially for Michael by plastering and procuring furniture for the same, etc.   True, *Tempest* claims to have paid for most of said furniture with money received from Michael. Whether Michael actually had the amount of money claimed at the time, in view of his want of funds when he started from Stephen's, may well be doubted, but it is not of much significance.   Whether Michael was at *Tempest's* house three weeks, or only one week, previous to the execution of the will, it would seem that much of the time was occupied by him in talking about making a will, the treatment he had

received from his other relatives, and assurances that he should remain there as long as he lived.

It is claimed by *Tempest*, in effect, that for a time he put off Michael's proposition to make such will, generally with the remark that Michael would live as long as he did, and that, upon his first taking him to Baraboo, he dissuaded him from making any will. Such hesitancy and delay on the part of *Tempest* seem to have stimulated Michael's desire for immediate execution; and such may have been the purpose. However that may have been, nothing seems to have fallen from the lips of *Tempest*, during the time, inconsistent with his ultimately yielding, as he did, to accept of Michael's bestowment. At first, *Tempest* testified that Michael was sober and refused to take wine on the day the will was made, December 2, 1884; but on cross-examination he testified that he persuaded Michael to drink a glass of sour wine, and that he took a glass himself at the same time; that Michael would run to extremes, and either drink too much or too little, and that when he took too little he would try and persuade him to drink some, but that he did not generally succeed; that he had " many a score of times " persuaded him to take a glass. That afternoon, *Tempest* took Michael to Baraboo to have his will drawn. They at first went to the county judge, but he declined to draw it. Then they went to the house of Mr. Brown. He was not there at the time, and so *Tempest* went and got him, and he drew and witnessed the will and retained it in his custody, and then acted as attorney for *Tempest* on the probate thereof, and ever since. Mr. Brown had been acquainted with *Tempest* for some thirty years, and prior to making the will had been attorney for him in at least one case. With the consent of Michael, *Tempest* went after the other witnesses to the will,— Mr. Stanley and Mr. Ruland. The will was drawn at the house of Mr. Brown about 7 o'clock in the evening. Mr. Stanley testified, in effect, that Michael

requested him in the afternoon to be a witness to the will, and told him how he was going to dispose of his property; that he had then been drinking; that he smelled his breath, but thought he knew what he was doing and what he wanted, and hardly thought he was under the influence of liquor; that when he executed the will he seemed to be a little more stupid, or something,— not quite so bright,— but seemed to understand what he was doing. Mr. Brown testified that he wrote down through the first bequest to *Tempest* of seventeen hundred dollars *and ninety-five cents* under the dictation of Michael, and before *Tempest* came with the other witnesses, and after that he wrote the residuary clause. The reason for two such bequests, and both to *Tempest*, is not explained. Mr. Ruland testified, in effect, that at the time of executing the will Michael talked about not being treated well at the place he had been before; that *Tempest* then said that he (Michael) could stay with him as long as he wanted to, and that he would take good care of him; that Michael then said, in reply, that he wanted to leave all his property to *Tempest;* that *Tempest* agreed to take care of him and furnish him a home.

Such were the circumstances under which the will was executed. It appears from the testimony, in effect, that subsequently, and about April 1, 1885, Michael's guardian went to see him at *Tempest's* house, and was there informed that he was sick; that Michael then agreed to go to Lodi with him; that some three days afterwards he went after him again, with three men and a doctor; that Michael then said he did not feel like going; that he then called the doctor in to examine him; that *Tempest* then wanted to know of the guardian what authority he had for taking him, and to show his papers; that when Mr. Currie told *Tempest* that he was Michael's guardian but had no papers with him, *Tempest* said he could not go; that he would die

before he would let his brother be taken from his house; and so the guardian left without taking Michael with him.

Upon the testimony thus summarized, we cannot hold that the finding of the jury upon the question of undue influence is contrary to the evidence. The case is very peculiar. Michael was seventy years of age when he made this will. He left his family in a foreign land when he was only about twenty-eight years of age. Though alone, he never had the force of character requisite to accumulate any property by his own exertions. He had for several years been the victim of an uncontrollable appetite, which had grown into a burning passion. In this condition, he suddenly inherited a considerable property from a daughter whom he had not apparently seen since she was a child. To save him and his estate from being consumed by his own passion, his property and person were place under guardianship. A brother, seven years younger, with apparent self-control, listened with seeming approval to his story of ill-treatment from friends who had thus been trying to save him from his destroyer; and then, with a saloon in his house, deliberately offered him a home as long as he lived, with full and free opportunity to drink when and what he pleased, regardless of results. Too depraved in appetite and passion to fully realize the dangers of his environments, too weak to resist or retreat from the seductive temptations thus presented, with a gloomy remembrance of a recently unsatisfied appetite, with an eager desire to make such opportunities for debauch continuous, he responded to the insidious suggestions for a permanent home by making *Tempest* his sole legatee and devisee. It may fairly be inferred from the evidence that such assurances of a permanent home were repeatedly made before the will was drawn, and probably offered as an inducement for Michael to leave his former home and restraints.

It is well settled that where the party to be benefited

by the will has a controlling influence or agency, or is particularly active in procuring the execution of the will, it is universally regarded as a very suspicious circumstance, requiring the fullest explanation. *Paske v. Ollat*, 2 Phillim. Ecc. 323; *Barry v. Butlin*, 1 Curt. Ecc. 637; *Edmonds v. Lewer*, 11 Jur. (N. S.), 911; *Crispell v. Dubois*, 4 Barb. 393; *Newhouse v. Godwin*, 17 Barb. 236; *In re Welsh*, 1 Redf. Surr. 238; *Harvey v. Sullens*, 46 Mo. 147; *Davis v. Dean*, 66 Wis. 100; *Yardley v. Cuthbertson*, 108 Pa. St. 395. Especially is this so where such active agent occupies a confidential relation to such testator; as in the case of attorney and client, physician and patient, priest and parishioner, or other relationship calculated to inspire confidence and trust in such testator. *Ibid.* The influence of an unlawful relationship is naturally and ordinarily unlawful, in so far as it respects testamentary dispositions favorable to the unlawful relationship and unfavorable to the lawful heir. This was so held in a case where the testator was living in adulterous intercourse with the mother of the beneficiaries. *Dean v. Negley*, 41 Pa. St. 312. This is somewhat similar in principle to the case at bar. Under all the circumstances, we are constrained to hold that the finding of undue influence by the jury is supported by the evidence.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with directions to enter judgment upon the verdict of the jury and in accordance with this opinion, rejecting probate of the will, and for further proceedings according to law.

Upon a motion for a rehearing there was a brief for the respondent by *William Brown*, attorney, and *H. W. Chynoweth*, of counsel, and a brief for the appellant by *W. S. Stroud*. The motion was denied June 20, 1888.

See note to this case in 37 N. W. Rep. 236.— REP.