SHAWVAN and others, Respondents, vs. SHAWVAN, Appellant, and SHAWVAN, Respondent.

*May 3 — May 21, 1901.*

*Fraud: Undue influence: Setting aside deed.*

In an action to set aside a deed it appeared, among other things, that six months before her death, the grantee, a woman about seventy-seven years of age, made a will disposing of her property among her children; that nine days before her death, when she was weak from long sickness, two of her sons, by threats and artifice, persuaded her to destroy the will and deed the property to one of them; that the deed was so made and recorded, the sons agreeing to share the proceeds; and that two of the sons, one of whom was an attorney who drew the will, were in the city and, though near at hand, were not called in, but on various occasions, shortly before and after the deed was drawn, were prevented from seeing their mother in her last sickness. *Held*, sufficient to support findings that the deed was procured by fraud and undue influence.

APPEAL from a judgment of the circuit court for Milwaukee county: D. H. JOHNSON, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Edwin S. Mack*, attorney, and *William R. Plum*. and *William E. Cloyes*, of counsel, and oral argument by *Mr. Mack* and *Mr. Cloyes.*

For the plaintiffs there was a brief by *Toohey & Gilmore*, attorneys, and *K. Shawvan*, of counsel, and oral argument by *John Toohey.*

Shawvan and others vs. Shawvan.

CASSODAY, C. J. It appears from the record that Mary Shawvan, a widow, seventy-seven years of age, died intestate at her home in Milwaukee, February 7, 1900, leaving, her surviving, six children, three of whom are plaintiffs in this action, and two of whom are defendants in this action, and the other, Kerillo, was a witness on the trial.

This action was commenced February 12, 1900, for the purpose of setting aside and having declared void a deed, executed by the deceased January 29, 1900, of the house and lot where she resided to the defendant *Douglas Shawvan*, and recorded on the same day, on the ground that the same was procured by the defendants by fraud and undue influence, and without any consideration. The defendants, *Douglas* and *Oscar*, each separately answered by way of admissions, denials, and counter allegations. The cause being tried, the court, at the close thereof, found as matters of fact, in effect: (1) That the mother died February 7, 1900, at the age stated, leaving, her surviving, the six children named, as her sole heirs at law; (2) that February 12, 1900, the son Kerillo, for value received, assigned, transferred, and set over all his right, title, and interest in and to all of the real estate owned by his mother to his brother *Sobieski* by proper conveyance; (3) that in 1884 the mother purchased the real estate in question for $1,800; that the property at the time of her death was of the value of $2,500, and was all the property she possessed, except a small amount of personal property; (4) that in the fall of 1899 the deceased was taken sick, and gradually grew worse up to the time of her death; (5) that January 29, 1900, the defendants, *Douglas* and *Oscar*, while present together at the home of the deceased, conspired together to procure a deed of the real estate from the deceased to the defendant *Douglas*, with the understanding between them that *Oscar* was to receive $500 from *Douglas*, and by means of fraud and undue influence, and in pursuance of such conspiracy, the defendants

on that day caused a deed of the real estate to be signed, wherein *Douglas* was the grantee and the deceased was the grantor; that at the time of signing the deed by the mother she was physically weak from long-continued sickness, which somewhat weakened her will power, and her situation and condition at the time were such as to render her unable to resist the importunities and influences brought to bear upon her by the defendants, and that the deed was not the free and voluntary act of the deceased, but was procured from her by fraud and undue influence practiced upon her by the defendants; that the procuring of the deed was so accomplished by the defendants without the knowledge of the other heirs, and was kept a secret from them by *Douglas* and *Oscar*, and that all of them, with the possible exception of the plaintiff *Mrs. Metz* were on friendly terms with the deceased; that Kerillo and *Sobieski* — two of such heirs — were in the city, and near at hand, at the time the deed was procured, and could have been easily called in; that the deceased, just prior to the signing of the deed, asked for Kerillo, but the inquiry was ignored by *Douglas;* (6) that at the time the deceased signed the deed she was not indebted to, or under any obligation whatever to, *Douglas,* the grantee therein named; that the allegations in the answer of *Douglas* that he had advanced large sums of money to assist the deceased to purchase the real estate were untrue; that, if he had advanced money, it was a very small amount, and was by the deceased repaid to him many years ago; that the $500 mentioned in the deed as consideration was not paid to the deceased, and that at the time of obtaining the deed the defendants well knew that the deceased could live but a few days or weeks at the furthest; (7) that the defendants caused the deed so obtained to be recorded in the office of the register of deeds January 29, 1900; (8) that in the summer of 1899 the deceased made her will distributing her property among all her children

except *Mrs. Metz;* that her direction as to how she desired her will drawn was written by herself, and clearly shows how she desired to dispose of her property; that *Douglas* caused such will to be destroyed a few hours before the deed was drawn, January 29, 1900; that notice of the pendency of this action was filed; that all the other material allegations of the complaint were fully proven and true.

And as conclusions of law the court found, in effect, that the plaintiffs were entitled to a judgment against the defendants vacating and setting aside the deed from the mother, Mary Shawvan, to the defendant *Douglas Shawvan,* dated January 29, 1900, and recorded on that day, and ordered judgment to be entered accordingly, together with the costs and disbursements of this action, to be taxed against the defendants. From the judgment entered thereon accordingly the defendant *Douglas Shawvan* brings this appeal.

Are the findings sustained by the evidence ? It appears that the deceased had been a widow for more than twenty-seven years. She had raised a family consisting of the six children mentioned. All of them, except *Douglas,* had families of their own. Kerillo had practiced law in Milwaukee for twenty-one years. *Rinard* had been a lawyer for twenty-two years, and was located at Dennison, Iowa. *Sobieski* had resided in Janesville for eleven years, and was a traveling man. *Oscar* had resided in Belvidere, Illinois, for twenty years.. *Mrs. Metz* had for some time resided in Chicago. *Douglas* was unmarried. For some time prior to May, 1884, he had been in the employ of the Chicago, St. Paul, Minneapolis & Omaha Railway Company as a switchman and brakeman, and stationed at St. Paul. May 14, 1884, he came from Elroy to Milwaukee, and a month afterwards went to Chicago, and entered the employment of the Chicago & Northwestern Railway Company, and continued in such employment until April, 1887; and since that time had been in the employment of the D. M. Ferry Company as travel-

ing agent. December 5, 1888, he bought a farm of his brother *Oscar*, for which he was to pay $1,600. Between 1888 and 1893 he bought two tracts of land, the bank carrying him on a good deal of his paper. In the meantime the deceased — the mother of those children — had secured a homestead at the price and for the value found by the court. It was all the property she possessed, except a small amount of personal property. Some time prior to August 12, 1899, she conceived the purpose of making her will, and so wrote to her son Kerillo, requesting him to draw her will, and to bring it over at his leisure, and stating therein just how she wanted to dispose of her property, and to the effect that she had "thought of it long, and considered it in all its bearings," and then, after stating that she wanted to give certain articles of personal property named to *Sobieski*, *Rinard*, and *Douglas*, respectively, she said: "All the rest of my property I want sold and divided as follows: It shall be divided into six parts: one part to *Sobieski*, one part to you, Kerly, one part to *Rinard*, one part to *Douglas*. Of the remaining two parts I want you, Kerly, to have one hundred dollars, and the balance of the two parts I want to go *Oscar*. In case either of the above-named should die before a final settlement of this instrument is completed, the part which would have been theirs I wish divided equally with those that are living. Mary Shawvan." August 12, 1899, she wrote to *Rinard* to the effect that she had so far experienced a very unpleasant summer; that she had not raised a hoe in the garden since she planted in the spring; that she had got Kerillo to write up the way she wanted her little effects disposed of in case she left any behind her; that it was, as she thought, all right; that it suited her anyhow; that she thought "every one ought to do so when they are able;" that it would "neither shorten nor prolong life." It is conceded that she made her will as stated in her letter to Kerillo, thus distributing her property to her children in substan-

tially equal parts, except that she left out her daughter, and
gave *Oscar* nearly double any of the others. In October,
1899, she was taken sick. She was then living alone at her
home in Milwaukee. She wrote to her son *Rinard* in Iowa,
and he came; and in the last of October he took her to the
home of his brother *Sobieski*, in Janesville, where she re-
mained until January 25, 1900. During that time she grad-
ually grew worse. December 20, 1899, she again wrote to
*Rinard*, to the effect that she experienced no particular gain;
that the family had been very kind, and done all they could
for her, but that eight weeks were long enough; that *So-
bieski*, who was a traveling man, had been home only two
days, but would be there for Christmas; that *Douglas* would
finish work in the South, and would be there about January
12, 1900, and then she would go home with him. *Douglas*
did not get to Janesville until January 17, 1900, and he
claims that his mother proposed to deed to him the house
and lot if he would promise to quit work, and remain with
her, and take care of her. *Sobieski* was then absent from
home, traveling. The next day after *Douglas* so reached
Janesville, he wrote his brother Kerillo a letter as follows:

"Janesville, Wisconsin, 1–18, 1900.
"*K. Shawvan*, Dear Bro.:
"Mother is very low. The doctor tells me she may pass
off at any time. But, to save her, she should be moved. This
noise will kill her. Now be here (Sunday) sure. I will not
work any more this year if I can get her home. The doctor
says she can be moved all O. K. with no more danger of los-
ing her life than one heavy noise. Now, in the name of
humanity, come, and help me get her home, and I will stay
there and care for her.            Your Bro. Douglas.
"*Let one know I wrote.*"

On the same day he wrote his brother *Rinard* this letter:

"Janesville, Wis., Jan. 18th, 1900.
"*Mr. R. Shawvan, Dennison, Iowa.*
"Dear Brother: I got here yesterday after the doctor
had left. To-day he came at noon, and has just left. The

conditions are this: Mother has dropsy. It started in her feet, and has gone upwards, until now it is about the hips, and may cause death at any time. It is your duty to come here now. Come prepared to stay for four or five days. There are many things I cannot write. This is or should be enough. Come and come at once.

"Your Bro. D. SHAWVAN."

Four days afterwards the deceased wrote to *Rinard* as follows:

"Have been and am still very sick. Got a good Dr., who says in a few day I can be removed to Milwaukee, which I am terribly anxious to do. Now, I'll wire you when he says I can go. Will you come and help remove me? *Dud* is here taking care of me, and must go to Milwaukee before long, and, in order to have proper care, I will go with him; but it will not be until I get Dr.'s consent. I am not intending to talk this to *Beck's* family. Please write if you will be at liberty to help. Dr. says he hopes in three or four days I will be able to go."

Three days after that, being Thursday, January 25, 1900, she was taken to her home in Milwaukee by *Douglas*.

*Oscar* testified to the effect: That Saturday, January 27, 1900, he came from Belvidere to his mother's house. That the next day (Sunday) *Douglas* introduced the subject of getting the deed from his mother. That a good deal transpired between himself and *Douglas* in respect to the matter. That he (*Oscar*) was to help *Douglas* get the deed, for which he was to receive $500. That the first step was to get the will which Kerillo had drawn the August before. That *Douglas* wanted to get the will to destroy it. That for that purpose he (*Oscar*) went to Kerillo's house that evening about eight o'clock to get the will. That Kerillo promised to come over to his mother's house that evening, and did, but did not bring the will. That the next morning (Monday) *Douglas*, in order to get the will, talked *to* his mother in regard to it, and said to her in *Oscar's* presence: "I am going to quit the ranch. I can't stay any longer. I am throwing away my time. The rest will come here and get

this property, divide it up, and I won't have anything in it. I am not going to stay." That *Douglas* then got ready to go, and his mother asked him (*Oscar*) what to do; and he told her to "give him the deed, that is the only way you can do." That the agreement between him and *Douglas* was that *Douglas* was to pay him $500, and that he had already received from him $210.

Kerillo testified to the effect that when *Oscar* came to his house for the will on Sunday evening his older brother, *Sobieski*, was there; that *Oscar* said that his mother wanted him to bring the will over; that he got there about half past nine; that *Douglas* asked him if he had the will, and he said "No;" that *Douglas* swore at him because he did not bring it; that he requested the privilege of speaking to his mother privately, but *Douglas* refused to leave the room, and became boisterous and more or less profane about it; that he asked his mother if she wanted to change her will, as he had brought paper with him; that she then expressed a desire to see her will, and he then promised to bring it to her the next morning, and did about ten o'clock; that, as he went in, *Douglas* asked him if he had the will, and when he told him that he had he said he wanted it; that he told him he could not have it, as it was his mother's will, and thereupon gave it to his mother, and requested *Douglas* and *Oscar* to leave the room, and allow him to speak to his mother privately, which *Douglas* declined to do, with profanity; that he then asked his mother if he should let *Douglas* take the will, and she said "Yes;" that *Douglas* then took the will, and read it partly through, and then said it should be destroyed; that he then told him he must not destroy his mother's will, and handed it back, and he placed it in his mother's lap, and she tore it partly through, and told them to burn it, and *Oscar* took it out of the room. Rudzinski, a notary public, testified to the effect: That *Oscar* came for him to draw the deed from his mother to

*Douglas.* That when he came in *Douglas* said to his mother: " This is Mr. Rudzinski. He is to draw the deed." She said, " Where is Kerly?" *Douglas* said, " We don't need Kerly. We brought Mr. Rudzinski because you know him, and you claim more confidence in him than any stranger." She said, " I thought Kerly was coming." He said, " We don't need Kerly." That he then drew the deed, and it was executed by the deceased. That when they got through he heard footsteps coming on the side of the house, and *Douglas* said: " Hurry up. Get out of the room. We will have trouble with Kerly;" and they went out.

*Sobieski* testified to the effect that he called at his mother's house a little before noon on that same Monday, January 29, 1900; that *Douglas* and *Oscar* were there, and the doctor was fixing his mother's limb; that he started to go in to see it; that *Douglas* shut the door, and said, " You keep out;" that he protested, and that *Douglas* became very abusive and profane, and his mother said twice, "Don't, boys," and so he bid his mother good-by, and left. *Mrs. Metz* testified to the effect that she went to her mother's house February 2, 1900, and found *Douglas* and *Oscar* there; that *Douglas* refused to allow her to go in to see her mother, and said that her mother did not wish to see her; that she told him she had come to take care of her mother, but he said they did not need any assistance; that she finally was allowed to see her, and talk with her, but was not allowed to care for her, except that, after her mother requested it, she was allowed to bathe her mother's hands and face. February 2, 1900, and four days after the execution of the deed, *Douglas* sent this telegram to *Rinard:* " Mother dying. If you want to see her alive, come." Five days afterwards she died.

The transaction of destroying the will and obtaining the deed was not only bold, but disgraceful. The will was made with thought and deliberation, and expressed the mother's desire in respect to the distribution of her property

among her children.   There is no evidence of any change of her feelings or judgment in respect to any of her children after the making of her will.   Nine days before her death her helpless and impaired condition was such that she could no longer withstand the threats and artifice of *Douglas* and the persuasion of *Oscar*, who had his price; and, with the other children barred from her presence, she was compelled to yield to the dominating influence of her two sons.   Such a transaction cannot have the sanction of law.   *Will of Slinger*, 72 Wis. 35; *Disch v. Timm*, 101 Wis. 191, 192, and cases there cited.   The evidence seems to be sufficient to support the findings that the deed was procured by fraud and undue influence.

*By the Court.*— The judgment of the circuit court is affirmed.