WILL OF SOWKA: KONDZIELLA, Appellant, vs. ESTATE OF SOWKA, Respondent.

*September 13—October 16, 1945.*

For the appellant there was a brief by *Fischer, Brunner & Strossenreuther* of Shawano, and oral argument by *R. H. Fischer*.

For the respondent there was a brief by *Winter & Koehler* of Shawano, and oral argument by *P. J. Winter*.

BARLOW, J. Mae Louise Kondziella filed objections to the admission of the will and codicil of Johanna Sowka to probate, alleging: (1) That the execution of said instruments was procured by the exercise of undue influence upon said deceased by Joseph Drzewiecki and others, and (2) that at the time of the execution of said instruments the said deceased was of unsound mind and was not possessed of sufficient mental capacity to make a will.

Johanna Sowka, a resident of the town of Maple Grove, Shawano county, was widowed in October, 1936. The Sowkas had no children, but had taken into their home and raised a nephew, Frank Kondziella, and his two sisters, Minnie Springer and Marie Tompkins, the children of a deceased sister of testatrix. Mae Louise Kondziella is a daughter of Frank Kondziella. At the time of the death of her husband, the Sowkas lived on a small plot of ground of approximately seven and one-half acres valued at $800. This home was about two miles from the village of Pulaski. Besides this small home the Sowkas had accumulated in excess of $6,000 in money, and in addition had loaned to the church the sum of $1,000, on which they were to receive interest for life, the principal obligation to be canceled on the death of both.

Frank Kondziella was a veteran of World War I, and was forced to reside in Arizona for some time prior to his death, October 30, 1941, because of tuberculosis. He visited the Sowkas and corresponded with them. He was home for the funeral of Mr. Sowka, and after the funeral made arrangements with Jake Styczynski, a neighbor and close friend of long standing, whereby Styczynski was to work the land, pay taxes, and insurance, and see that Mrs. Sowka had wood, fuel, and groceries, and furnish her milk. He was also to look after her welfare generally. In consideration of the

foregoing a joint tenancy of the land in question was created in the names of Mrs. Sowka and Jake Styczynski. Mrs. Sowka continued to live on the premises under this arrangement, without objection or criticism, from October, 1936, until the late summer of 1939, when one Mrs. Rozanski, an old-age pensioner, attempted to borrow $250 at one time and $500 at another time from Mrs. Sowka. Jake Styczynski strongly advised against the loans, and when Mrs. Sowka and Mrs. Rozanski came to the home of Anton Olejczuk on their way to the bank to obtain the money to make one of these loans, Anton Olejczuk asked them to remain at the house, and in the meantime went to the bank and urged the banker not to release the funds. The banker talked with Mrs. Sowka that evening, and the loans were not made. Shortly thereafter, on July 17, 1939, one Harry Dryja, a son-in-law of Mrs. Rozanski, petitioned the Shawano county court, requesting that one Joseph Drzewiecki be appointed as guardian for Mrs. Sowka. On August 15, 1939, he was so appointed. L. W. Cattau was the attorney in these proceedings.

While Kondziella was home in 1936, $3,750 of the cash on hand were invested in government bonds payable to Johanna Sowka, also known as Anna Sowka, and Frank Kondziella, or the survivor. The balance of cash, amounting to about $2,000, was permitted to remain in the bank. The evidence is undisputed that Mrs. Sowka regarded Frank Kondziella as her adopted son and as her own flesh and blood, and also regarded Frank's two sisters as adopted children. She had complete confidence in Frank Kondziella.

About November 1, 1939, Mrs. Sowka was moved from her home to the home of her guardian. At that time Mrs. Sowka was in good health, considering her age, but during the month of November was confined to her bed for two weeks with a cold. She was over eighty years of age, and the petition in the guardianship proceedings recites that she was unable to care for her property by reason of her age. At the

commencement of the guardianship the cash balance in the bank was $1,885. In addition to this there were the government bonds of the par value of $3,750, the joint-tenancy agreement as to the land, and the income from the loan to the church. Stella Schumek, a daughter of the guardian, was employed to clean the room of Mrs. Sowka and do her washing, for which she was paid $10 per week from the time Mrs. Sowka came to the home of the guardian, and an additional charge of $5 was made by the guardian for board and room.

On November 10, 1939, the guardian went to the office of his attorney, and signed a petition to the county court for the appointment of an attorney to set aside the joint-tenancy deed of the seven and one-half acres to Jake Styczynski, and to set aside any interest of the nephew, Frank Kondziella, in the government bonds. This petition was not filed with the court. On November 19, 1939, the guardian called at the office of his attorney, L. W. Cattau, and gave him necessary information from which to prepare a will. The guardian testified that he had no knowledge of what Mrs. Sowka wanted in her will, but on cross-examination hesitatingly admitted that he told Mr. Cattau that one of his daughters was to receive $100 and his daughter Stella Schumek was to receive $500 for taking care of the testatrix and to take care of her in the future as long as she lived. The balance of the estate was to be given to Josephine Drzewiecki, wife of the guardian. Mr. Cattau, the attorney, gave the will to the guardian after it was prepared, for him to have it executed. The guardian testified that he did not have this will executed, as he believed an attorney should be present when the will was signed, and proceeded to the office of attorney David H. Winter, and employed him to go out to his home and make a will for Mrs. Sowka. Vincent J. Shippy, the family physician, was present when Mr. Winter called at the home, and acted as interpreter, Mrs. Sowka not being able to speak English too well. Mr. Winter prepared a will, making the same disposition of

the estate as the guardian had requested Mr. Cattau to provide in the will he prepared, which was executed November 20, 1939. The guardian's wife, chief beneficiary in the will, testified that a few days after the execution of the will she talked with Mrs. Sowka and suggested that some provision should be made for the nieces who had been reared in the home of Mrs. Sowka, and that Mrs. Sowka agreed this should be done, and that she then wrote a letter to Attorney David Winter stating that Mrs. Sowka had forgotten certain items and that they should be included in the will. Mr. Winter prepared a codicil, giving $50 to Mrs. Minnie Springer, designating her as an "adopted daughter," and giving $5 each to Ed Tompkins and Myrtle Tompkins, the children of Marie Tompkins, Marie Tompkins being designated as an "adopted daughter" and "deceased." In fact, Marie Tompkins was alive at the time. The codicil was forwarded to the home of the guardian and executed on the 27th day of November, 1939, Mr. Winter not being present.

On January 8, 1940, the guardian commenced an action to set aside the joint-tenancy deed between Mrs. Sowka and Jake Styczynski, alleging that the same was obtained by undue influence and without consideration. The action was unsuccessful, and on September 9, 1940, the guardian petitioned the county court to sell Mrs. Sowka's one-half interest in the land to a son of the guardian for the sum of $225. The court confirmed the sale.

Mrs. Sowka continued to live at the home of the guardian until May 18, 1942, when she was placed in the county home. She died there May 12, 1943.

The trial court found that testatrix was mentally competent at the time of the execution of the will, and that there was no undue influence exercised by the guardian or others upon the deceased. These findings are not ordinarily disturbed unless against the great weight and clear preponderance of the evidence. *Will of Schaefer* (1932), 207 Wis. 404, 241 N. W. 382; *Will of Grosse* (1932), 208 Wis. 473, 243 N. W. 465.

To establish undue influence in the execution of a will, elements to be proved are: A person unquestionably subject to undue influence, opportunity to exercise such influence, a disposition to influence unduly for the purpose of procuring an improper favor, and a result clearly appearing to be the effect of the supposed influence. *Estate of Scherrer* (1943), 242 Wis. 211, 7 N. W. (2d) 848, and cases there cited.

Testatrix was at least eighty-one years of age at the time of the execution of the will and codicil and had been living alone since the death of her husband in 1936. The undisputed testimony is that she was easily influenced in financial matters, and prior to the time of the execution of this will and codicil she was disposed to make loans of considerable sums of money, in view of the assets which she owned, to a woman who was a public charge and had no means of repaying the loan. Two of her neighbors strongly urged her not to make the loan, and one of them had her stay at his home with the would-be borrower while he went to the bank and requested the banker not to release the money. It is true, as the court points out in his opinion, that one witness testified that Mrs. Sowka told him she went to the banker and instructed him not to give her money when she came to the bank with would-be borrowers, but if this was done it was only after her friends had warned her against making the loans in question. The trial judge places considerable stress on this claimed act of the testatrix as an indication that she was competent as a business woman, and not subject to undue influence. He failed to give any consideration to the fact that two friends had advised against a loan, and one of them went to the banker and requested that he do not release any of the money for this loan. However, the trial court found that she was unquestionably subject to undue influence and that the guardian and the beneficiaries had an opportunity to exercise such influence.

Whether there was a disposition to influence unduly for the purpose of procuring an improper favor and a result clearly appearing to be the effect of supposed influence may well be considered together. A ward has a right, even though under guardianship, to make a will, but where the guardian or his immediate family are the large beneficiaries the question of undue influence will be scrutinized carefully. *Will of Slinger* (1888), 72 Wis. 22, 37 N. W. 236; *Will of Valley* (1930), 202 Wis. 434, 232 N. W. 845.

The testatrix was under guardianship at the time of the execution of the will and codicil, Joseph Drzewiecki having been appointed her guardian August 15, 1939. At that time testatrix was living alone on the small parcel of land where she had lived for a number of years. She had been able to take care of herself with the assistance of a friendly neighbor. The petition for the appointment of a guardian was made when the loans were not made to a woman who was a public charge and had no means of repaying them. The petition for the appointment of a guardian was made by a person not related in any way to the testatrix, but by the son-in-law of the woman who had been unsuccessful in obtaining loans.

At the time of the death of Mr. Sowka in 1936, the nephew, Frank Kondziella, with the co-operation of Mrs. Sowka, made arrangements for her care with a neighbor who had always been very friendly and helpful. By this arrangement the neighbor was to work the land and pay the taxes and insurance, and see that testatrix had wood, fuel, and groceries, and milk was to be furnished by him free of charge. He was to look after her welfare generally. In 1939, prior to the appointment of the guardian, this neighbor Styczynski, realizing that Mrs. Sowka was getting weaker with age, arranged to take her in his own home for the winter, where she could occupy the rooms which his father and stepmother had occupied when they were alive, and she was very happy about it. That the arrangement made in 1936 was beneficial to the

testatrix is shown by the fact that she had $2,000 in cash in the bank at that time, and three years later she still had $1,885.

About two months after a guardian was appointed he took the ward to his home. This was a farm home. From the time she was taken into his home the guardian charged $5 a week for her board and room and paid his daughter, who was at home, $10 per week for caring for her room and doing her washing. This was in a rural farm area in the fall of 1939. The guardian at the same time, in his account, charged $77.15 for travel expense in caring for the ward during the two months' period while she remained in her own home, and an additional $31.15 for travel during the first month the ward was at his home, making a total of $108.70. Within ten days after she came to his home, the guardian signed a petition asking for the appointment of an attorney to set aside the joint deed of the seven and one-half-acre home tract made with the neighbor in consideration of care and support to be furnished to her by the neighbor, and also to begin an action to cancel any claimed interest of the nephew, whom she considered her own flesh and blood, in the joint ownership of the government bonds. About this time testatrix was taken sick with a cold and confined to her bed, and the guardian went to his attorney and requested him to draw a will for his ward. On direct examination he denied any knowledge of the contents of the will, but later, on cross-examination, hesitatingly admitted that he told his attorney that one of his daughters was to receive $100 and the daughter who was receiving $10 per week for caring for his ward was to receive $500, and the balance of the estate was to go to his wife. The trial court, in his opinion, arrived at the conclusion that the guardian informed his attorney as to what the contents of the will were to be at the time he consulted him. The attorney prepared the will and delivered it to the guardian with instructions to have it executed. The guardian then testified that he was dissatisfied, as he felt it was necessary for the attorney to be

present at the time the will was drafted and executed. He is very elaborate and emphatic in his testimony that he did not take the will home for execution for this reason, and on the same day he consulted another attorney in the same city, and requested that he come out to the home and prepare a will for Mrs. Sowka. The attorney immediately went to the home, and with the assistance of the family physician as interpreter, obtained the facts and prepared the will, which was executed the following day, on November 20, 1939, while Mrs. Sowka was confined to her bed in the guardian's home.

By the terms of this will, members of the guardian's family received the same bequests that the guardian told his first attorney they were to receive. It was provided in the will that Frank Kondziella, whom she referred to as her "adopted" son, take nothing under the will as he had been amply provided for by having in his possession approximately $3,700 in government bonds, which she stated in the will belonged to her, *and said it was a part of her estate.* At this time a petition had been drafted and signed by the guardian, asking for the appointment of an attorney to terminate any rights of the nephew in these bonds and obtain possession of them. Frank Kondziella, the nephew, was alive at that time, but died two years later, October 30, 1941.

The guardian was named as executor in the will, and was informed of the contents by the attorney who drafted it at the time it was drafted, the will being left with the guardian. About a week later the wife of the guardian, who was the main beneficiary under the terms of the will, wrote a letter to the attorney who drafted the will, stating that the testatrix forgot certain items which she desired to have added to the will, which were that she desired to give to Minnie Springer, whom she referred to as her "adopted daughter," the sum of $50 and to Ed Tompkins and Myrtle Tompkins, the children of a person she referred to as her "adopted" daughter, Marie Tompkins, the sum of $5 each, stating that Marie Tompkins

was deceased. Minnie Springer and Marie Tompkins were sisters of Frank Kondziella, and the two girls who were raised by testatrix in her home. In fact, Marie Tompkins was alive at the time. The codicil was prepared and forwarded to the home of the guardian and was there executed without the presence of the attorney. This is significant in view of the elaborate testimony of the guardian that he obtained the services of another attorney when the first will was drafted because he considered it essential and necessary for an attorney to be present when the instrument was executed.

In arriving at his conclusion, the trial court places considerable weight on the testimony of the doctor who acted as interpreter and the attorney who drafted the will, both testifying that she was of sound mind at the time of the execution of the will, and that there was no evidence of undue influence. It would be very difficult for the scrivener to obtain much information from which he could conclude that the testatrix was of sound mind when he was obtaining his information through an interpreter. Both the scrivener and the witness to the will testified that they did not know the testatrix was under guardianship at the time the will was prepared. Both of them could well be unaware of the fact of undue influence exercised by the guardian and members of his family over this woman who was over eighty-one years of age and resided in his home, which influence could well have been exercised prior to the time the will was prepared. It is no reflection on either of these witnesses if they failed to observe that this was true.

It is certainly unnatural for the testatrix to make a will making no provision for two nieces and a nephew whom she had raised and was attached to as though they were her own children until the main beneficiary advised her to make at least a small provision for the nieces. We are forced to the conclusion that the conduct of the guardian and members of his family, whereby they were receiving $15 per week for the board and care of this able-bodied woman, considering her age,

and the large amount expended by the guardian for travel on behalf of the ward, all of which payments continued as long as the ward resided in the guardian's home, clearly shows a planned scheme to obtain her property, which was concluded with a will whereby the guardian's family would receive any balance that remained at the time of her death.

It is considered that the findings and judgment of the trial court are against the great weight and clear preponderance of the evidence; that undue influence over the testatrix was established by clear, convincing, and satisfactory evidence; that admission of the will to probate should have been denied.

*By the Court.*—Judgment reversed, and cause remanded with directions to disallow the admission of the will to probate.