WILL OF ROEHL: SCHOENWETTER, Appellant, vs. UNGER, Respondent.

*April 8—May 6, 1952.*

470

*Thomas J. Bergen* of Milwaukee, for the appellant.
*Edwin W. Knappe* of Milwaukee, for the respondent.

FAIRCHILD, J.  The deceased at different times made different wills.  Three of the instruments were presented for consideration to the county court.

The appellant appeals from the judgment admitting to probate the will of November 12, 1941, and urges that the evidence does not warrant the finding by the trial court of undue

influence being exercised upon the testatrix respecting the rejected wills mentioned in the statement of facts. In our review of the evidence we are concerned directly with the testimony bearing upon the presence of the four elements which are of controlling importance in cases of this nature: First, the disposition on the part of the beneficiaries to exercise undue influence over the testatrix; second, the susceptibility of the testatrix to undue influence; third, the opportunity for exercising undue influence; and fourth, the evidence of a result indicating its exercise upon the testatrix in procuring the execution of the wills of 1947 and 1948.

In judging the evidence, we find that the testatrix planned years in advance of her death for a natural and just division of her property among her living children. It equally appears that the children were in accord with their mother in arranging a plan which would result in her support and maintenance and then an equitable disposition of the property among the children. This plan was worked out among the children and their mother by the family lawyer, and under it the mother was to have the benefit of an income and the right to live in the home of any child according to her wishes. There were changes made in the legal setup of the plan, but no change was made affecting the distribution of the estate and the maintenance of the mother. The ownership of the property was changed from the first arrangement so as to vest the title in the mother. The boys died, and the interests of their heirs were acquired by the mother, as set forth in the statement of facts. The mother chose to live in the house which she rented to her daughter, Louise Unger. She rented apartments in a building at the front of the lot, one of which was rented to her other daughter, Elsie Schoenwetter, and her husband. Each detail of the transactions, as well as of the will of 1941, which was admitted to probate, was generally known and completely familiar to the living children and to Victor Schoenwetter, the husband of the daughter,

Elsie. There were no controversies nor any manifestation of a desire upon the part of anyone to bring about a further change until Victor Schoenwetter began his effort to acquire for himself something more than was arranged for by the testatrix. As shown by his testimony recited in the statement of facts, this effort on his part began about 1946 and continued until, surreptitiously, as far as Louise Unger is concerned, he, with Elsie Schoenwetter's assistance, succeeded in disrupting and overturning the plan and purpose so plainly indicated in the testatrix' arrangement as outlined in the deeds of conveyance, the agreements, and the completed will of 1941. He testified concerning the occasional meals given the mother at his house: "Well, it was getting a bit under my skin that I should be providing for the old lady where she was supposed to be provided for by Mrs. Unger."

As to the disposition on the part of the Schoenwetters to exercise undue influence upon the testatrix, it appears that before the Schoenwetters began to insist upon gaining an advantage over Louise Unger, the relationship between the sisters was cordial, and so far as Mrs. Unger was concerned she knew nothing of the change that had been attempted until her mother died. When the Schoenwetters succeeded in securing the later drafts of the wills of 1947 and 1948, Mrs. Unger, with whom the mother lived, and who cared for the mother, was eventually excluded as a beneficiary. The acts in the process show the determination of the Schoenwetters to gain this advantage from the testatrix by cutting down Mrs. Unger's inheritance, until finally there was accomplished this complete exclusion of her from all benefits her mother had planned that she should have. In attempting to justify the acts of the Schoenwetters in this respect, there was advanced during the trial the claim that there had been a sufficient and a favorable allowance to Mrs. Unger in the rent she paid for the use of the house. But, as a matter of fact, the evidence shows that the rental value of

the premises occupied by Louise Unger, where the testatrix resided, was the sum of $45 per month, and the rental value of the flat occupied by Mrs. Schoenwetter and her husband was $65 per month. Louise Unger paid $10 and had the benefit of a deduction of $35. The Schoenwetters paid $25 and thus had a benefit of a deduction of $40. Instead of excusing or justifying the Schoenwetters' feeling of dissatisfaction, this evidence tends to establish that the plan and purpose of the mother was to treat the daughters equally. Mrs. Unger cared for the mother for upwards of twelve years, buying clothes, shopping for her, paying for medicines and doctor bills, and rendering other assistance which would naturally be of service to an elderly lady. While the mother lived with Mrs. Unger, she did visit the Schoenwetters and occasionally ate a meal there. There is ample evidence of the disposition of the Schoenwetters to accomplish their desire to overreach by the exercise of undue influence, and a further instance of such disposition on the part of the Schoenwetters will appear later when we refer to the trial court's opinion describing the unnatural disposition of the mother's estate.

As to the susceptibility of the testatrix to yield to undue influence, it appears that, by reason of her years and at times enfeebled condition, she was easily influenced by suggested reasons for complaint. Although there is testimony in support of the appellant's contention that her mother appeared at times to be dissatisfied with Mrs. Unger, the evidence shows clearly, and the trial court was of the opinion, that it was her desire to be with Mrs. Unger; and she did continue to reside with her. Many of the details tending to show that advantage was taken of the deceased are not retailed in the statement of facts, and no useful purpose can be served by enlarging upon them in this opinion. All the other elements are so decidedly and positively established that the rule in the case of *Will of Link* (1930), 202 Wis. 1, 231 N. W.

177, controls on this point. See also *Will of Ehlke* (1943), 244 Wis. 115, 121, 11 N. W. (2d) 497; *Will of Stanley* (1937), 226 Wis. 354, 359, 276 N. W. 353; *Will of Lee* (1946), 249 Wis. 59, 23 N. W. (2d) 405; *Will of Kramer* (1949), 254 Wis. 202, 36 N. W. (2d) 64; *Will of Sowka* (1945), 247 Wis. 498, 19 N. W. (2d) 898; *Will of Downie,* 42 Wis. 66. In connection with the element of susceptibility to undue influence, the evidence shows that at times the Schoenwetters were able to divert the mother from consulting with the family lawyer to a stranger, who did not know of the original plan for the disposition of the estate and the maintenance of the mother, and who was unable to speak the German language or to understand it. And again on this point, it was a friend of the Schoenwetters who arranged for the meeting with the strange lawyer at Schoenwetters' home.

The evidence tending to show that Mrs. Roehl was comfortably and happily situated in Mrs. Unger's home and not only satisfied with the attention she was receiving there but, when away, expressed the desire to go back destroys any reasonable inference that she was actuated by her own free will in signing the instruments which the strange lawyer drew up. As appears from the statement of facts, all the surrounding circumstances showing the relation of the members of the family, the loyalty of Mrs. Unger to her obligation, the devotion of the sisters to their mother and to each other, prior to Victor Schoenwetter's insistence that his wife do something to reimburse him for meals which the mother had at his house, when reaching its culmination, showed a course of events and a result which could be accomplished only by overpersuasion of an elderly, easily influenced individual.

As to the opportunity for exercising undue influence, the references in the statement of facts and in this opinion show

clearly that the opportunity was sought by the Schoenwetters, acquired, and put into effective use.

As bearing upon the point of the accomplishment of the appellant in securing a result indicating the exercise of undue influence upon the testatrix, the trial court said with reference to the rejected wills:

"Now the motive comes into play. Up to that time the sole decider of motives was the testatrix. Now in my opinion, she no longer was.

"Fourth, and that significant language appears. 'In the event that Elsie Schoenwetter dies before I do, then I do direct that her husband, Victor Schoenwetter, is to receive her three-fourths ($\frac{3}{4}$) share of the residue of my estate; in the event that my daughter, Louise Unger, dies before I do, I do then direct that her one-fourth ($\frac{1}{4}$) share is to go to my daughter, Elsie Schoenwetter. . . .' Already they had the idea of getting it all. 'So as to give her the whole of my estate; in the event that both my daughters, Elsie Schoenwetter and Louise Unger, die before I do, in that event I direct that Victor Schoenwetter is to receive the entire estate.' And there's no question but what at that time there were other blood relatives on whom she was on friendly terms with, and yet she says if these things happen, this stranger to my blood shall take all my property. 'In the event that Elsie Schoenwetter dies before I do, I do then nominate and appoint Victor Schoenwetter as the executor of this estate and I direct that he be permitted to qualify as such executor without bond.'

"And then this significant language. Fifth: 'I do further direct that in the event that either Louise Unger or her husband, or any one on their behalf, should file any claim against my estate for any reason whatsoever, or particularly for any claim based upon room and board furnished to me, I do then direct that the said Louise Unger shall not receive her share of my estate, because I have made provision for the payment of said room and board during my lifetime by giving Louise Unger and her husband extremely low rent of my property in return for my room and board. . . .'

"And then we come to the 1948 will, and thus progress has made its way, dated October '48, October 5, 1948, and it provides, 'All the rest, residue, and remainder of my property and estate of whatever kind or nature, whether the same be real, personal, or mixed, which I may have or hereafter acquire, I do hereby give, devise, and bequeath to my daughter the whole thereof.' "

In a final summary of the elements of undue influence, the court, in its opinion, said:

"I find that she was subject to undue influence. She was eighty years old. She was subject to favoritism. I find there was ample opportunity, particularly from the period beginning in 1946, for the exercise of undue influence on her. I find that there was a disposition, particularly in the husband, to exercise undue influence, and I think that disposition was extended to his wife. . . .
"The result is plain, that by progressive tension one of the natural heirs was disinherited."

It is considered that the trial court's findings of fact are sustained by the evidence and that the provisions in the two rejected wills emanated from appellant; and that in her weakened and passive condition of mind, the testatrix did no more than merely assent, as found by the trial court.

*By the Court.*—The judgment admitting the will of 1941 to probate is affirmed.