BOARDMAN, Administrator, Respondent, vs. LORENTZEN, Appellant.

*January 13—February 3, 1914.*

*Conveyances: Fraud: Undue influence: Degree of proof required: Presumptions: Burden of proof: Right to dispose of property as against heirs: Evidence: Sufficiency: Witnesses: Competency: Husband and wife: Appeal: Findings of fact based on misconception of law.*

1. He who obtains property by will or otherwise through undue influence or consciously taking advantage of incompetency of the owner, commits a fraud of most serious character.

2. The common rule as to certainty of the existence of facts constituting fraud, applies, emphatically, in case of the wrong being that of obtaining property by undue influence or taking advantage of incompetency of the owner,—such facts are required to be established by clear and satisfactory evidence.

3. In a controversy as to whether property was obtained by undue influence, there is an evidentiary presumption in favor of the person charged, the same as in all cases sounding in fraud, that he did not perpetrate the wrong.

4. The charge of obtaining property by undue influence may be circumstantially, *prima facie*, established; but that requires these essentials: proof of a subject unquestionably susceptible to undue influence and clear and satisfactory evidence of opportunity to exercise such influence, a disposition to exercise such influence, and indication that it was in fact exercised.

5. Upon a *prima facie* case of undue influence having been circumstantially or otherwise established, there is no shifting of the burden of proof upon the accused more than in any other case where plaintiff's evidence, unexplained or uncontradicted, would entitle him to judgment.

6. In case of a charge of obtaining property by undue influence, *prima facie* or otherwise established, the defendant must meet such *prima facie* case to such extent, at least, that there is no longer clear and satisfactory proof of the facts constituting the charge of fraud.

7. The common evidentiary presumption in favor of judicially found facts does not exist where such findings are the result of misconception of law.

8. A person, however old, so long as he retains appreciation of his possessions and relations to others, may dispose of his prop-

erty in any lawful way he sees fit, and regardless of whether
his children or any one else may be pleased therewith.

9. The heirs at law of a person have no right to his property, ex-
cept subject to his pleasure,—he is not bound to consult them
or be influenced by their wishes, nor have they any right in
the matter except that he be left free to exercise his own
will.

10. A person having acted in the exercise of his right to dispose of
his property upon his own judgment, it is not within the
judicial function to disturb such disposal or do otherwise with
reference thereto than to conserve his intention.

11. If a person makes a disposition of his property in contempla-
tion of death and survives for a considerable period there-
after in such mental condition as to appreciate what he has
done, and gives no sign that such disposition was not his free
intelligent act, such circumstances are strongly evidentiary
of a disposition free from undue influence or incompetency.

12. A married woman, by direction of her husband, having written
a letter to another, she is competent to prove the contents of
such letter in case of that being material in a judicial inves-
tigation and satisfactory excuse being given for not producing
the writing.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for St. Croix
county: E. W. HELMS, Circuit Judge. *Reversed.*

Action to set aside a conveyance of property on the ground
of fraud. The issues tried are indicated by the following
abridgment of the decision: December 26, 1907, Jacob Sven-
son, deceased, a man about seventy-eight years of age and
possessed of $3,125 in personal property, for a promise on
the part of defendant and his wife to care for him during
the rest of his life, transferred the same to him. Mr. Sven-
son was incompetent to make such a contract. He was in-
duced to make it by un¹⁻ᵉ ⁱⁿᶠ¹ᵘᵉⁿᶜᵉ on the part of defendant
and his wife. They performed services on the faith of such
contract of the reasonable value of $500. Plaintiff, as per-
sonal representative of deceased, is entitled to judgment de-
claring said transfer void and that he recover the value of the

property involved, less the value of the services actually rendered therefor, with costs.    Judgment was so entered.

The findings were based on evidence more or less conflicting, supposed to indicate these circumstances: Mr. Svenson was somewhat feeble around about the time of the transaction in question and somewhat childish, impaired in memory, and much reserved in manner as compared to his habits prior thereto, particularly up to the time of the death of his wife in 1903.    He had several children and, prior to the transfer, expressed an intention to treat them equally in disposing of his property.    He gave all to defendant and his wife, placing the title in defendant's name.    Two persons outside of the latter's family were procured to be present at the time of the transfer.    One of such persons was a Mr. Anderson,—cashier of a bank in a near-by village who acted as legal adviser,— and the other was a neighbor who was asked to be present as a witness.    The presence of these two persons was directly procured by the defendant.    None of Mr. Svenson's children, except defendant's wife, was present during the transfer. Mr. Svenson had four children,—Sievert who resided some few miles distant from defendant's home and had not lived with his father since he was thirteen years of age, absence from the paternal home being more than twenty-five years,— another son who resided in a distant place and had been away from his boyhood home over twenty-four years, a daughter who also resided in a distant place, and the defendant's wife. The latter was the youngest child.    She lived with her father until after she was married and her mother died and perhaps a short period thereafter.    Before the death of Mrs. Svenson she and her husband, or the latter, had some thought of the family property being conveyed to their youngest daughter, or to her husband, or both of them in consideration of an agreement for permanent support.    None of the children, except defendant's wife, had paid any particular attention to the father for years before the particular transaction, and

neither of them were so circumstanced as to need any assistance from him. There were these undisputed facts: Mr. Svenson owned a small farm and transacted his own business and possessed and cared for his own property up to the time of the transfer to defendant. He had lived with the latter and his wife some little time before such transfer. He lived with them, contentedly, and was cared for by them, properly, and without any attention being paid to him by any of his other children, except Sievert, and no attention by him in particular, for considerably over a year. All of the time, except the latter part thereof, he remained in about the same mental condition as at the time of the transfer. At such time the business was done deliberately, some two hours being occupied in the transaction. Mr. Svenson gave all directions as to what should be done and was very emphatic about the matter. Neither defendant nor his wife made any suggestion favorable to themselves. Both advised the old gentleman to give part of his property to his absent children. He knew all about his property,—appreciated what it consisted of and the amount of it. Nothing was said or done in the year after the transaction, during all of which time his mental condition did not greatly change, showing dissatisfaction with what he had done. In addition to the undisputed evidence that Mr. Svenson thought of turning his property over, as stated, before his wife died to secure future support, there was evidence strongly tending to show that he thought of doing so shortly before and shortly after he went to live with defendant and his wife, or to transfer the property to some institution for the care of the aged to secure permanent support and care, and that Sievert was informed of that fact for the purpose of having him express his opinion in respect thereto, and that after the transfer Sievert was informed thereof and made no objection thereto. The old gentleman did his own business and kept it entirely within himself up to the time of the transfer. He lived on his farm for some

four years after his wife died.    For a short time a sister re-
sided with him.    Much of the time he resided alone.    When
he tired of that he endeavored to arrange with a neighbor to
whom he was accustomed to let his farm, to afford him a
home; but upon the neighbor declining to name what he
would charge for the service he turned to defendant and his
wife.    He made a pretty shrewd arrangement with them for
his board and adhered to it until it was suggested to him by
Sievert that he should pay a little more.    He paid for his
board, so far as appears, in a business way up to the time of
the transfer and manifested a desire to pay for any service
rendered, or which might be rendered him.

*Spencer Haven,* for the appellant.

For the respondent there was a brief by *McNally & Doar,*
and oral argument by *W. F. McNally* and *W. T. Doar.*

Marshall, J.    Were the conclusions of fact reached by
application to the case of correct legal principles?    Upon
surveying the evidence in connection with the treatment of it
in the opinion, filed by the learned judge before whom the
case was tried, we are strongly impressed with the idea that
he was efficiently influenced by a wrong notion of the law.

There is an absolute absence of any direct evidence that ap-
pellant or his wife, by act or word, ever suggested to Mr.
Svenson the idea of his conveying his property to them or
either of them, or that they 'influenced him to reside with
them, or that they ever interfered with his property or busi-
ness affairs in any way whatever.    On the contrary, as indi-
cated in the statement, the direct evidence, and circumstantial
as well, is to the effect that Mr. Svenson had his own way
with his property up to the time of the transfer, did his own
business, without soliciting or taking or receiving advice from
any one, with perhaps the exception that defendant aided
him somewhat at the time he sold the farm, all the transac-
tions in respect to which are admitted to be beyond suspicion,

and did not, by act or deed, show any dissatisfaction with the transfer to the defendant for the year afterwards, during which time, the evidence strongly tends to prove, he had sufficient mentality to appreciate the whole matter.

In view of the situation stated, some light is thrown on the manner in which the result was reached by observing that the trial judge indulged in the idea, for which there is some basis in the early decisions here, but which the court of late has endeavored, time and again, to correct, that upon a *prima facie* showing being made in a case of this sort, there is a shifting of the burden of proof to the side of the defendant, requiring him, in order to prevail, to prove affirmatively to a reasonable certainty, that the transaction was the free, voluntary, intelligent act of the deceased. That is all wrong. This court has said so in *Small v. Champeny,* 102 Wis. 61, 78 N. W. 407; *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939; *Winn v. Itzel,* 125 Wis. 19, 103 N. W. 220; *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8; and other cases.

It is unfortunate that trial courts now and then, cling, seemingly, to the idea of the shifting of the burden of proof in such cases, and in that way take a wrong view of the evidence. There is no more shifting of the burden of proof in this class of cases than in any ordinary case where the plaintiff by evidence in chief succeeds in making out a *prima facie* case. The burden of proof rests with him from the beginning to the end. The only distinguishing characteristic of the particular class is this: the court has held that some circumstances are sufficient to so lift the burden as to call for rebuttal. But all the defendant need then do is to produce sufficient evidence to so weaken plaintiff's case, that the circumstantial and other evidence in his behalf no longer establishes the fraud charged with the requisite clearness to warrant a decision in his favor. That is to say, a *prima facie* case, circumstantially made against the defendant, does not require him, in order to defeat it, to prove affirmatively that

the act challenged was free from any fatal taint, as if he were the plaintiff holding the burden of proof and required to so establish facts. The charge against the defendant in such a case as this, in effect, accuses him of having perpetrated a fraud of a serious nature. There is a strong presumption in his favor against such wrong doing, which persists to the end of the litigation unless overcome by circumstances inconsistent therewith, established by clear and satisfactory evidence. *Ball v. Boston, supra.*

The presumption mentioned exists in all cases where fraud is charged. This court said in *Winn v. Itzel, supra,* referring particularly to the decisions giving rise to the idea that there is a rule peculiar to this class of cases as regards the "shifting of the burden of proof:"

"We do not understand that the principle there approved changed the practice in fraud cases, or affected the order of the trial of such cases. Parties who charge fraud must prove fraud after as well as before that decision. They still have the burden of proof. . . . When the plaintiff makes a *prima facie* case, entitling him to relief if the proof stops there, the defendant must take up the burden and meet the case so made by other evidence. This is the case in all contests of fact."

Former decisions in this class of cases were not intended to go further than to announce what facts should be considered as *prima facie* proof of fraud requiring explanation by the defendant. With a view to making what was thought to have been plainly decided in *Winn v. Itzel* and other cases, unmistakable, this was said in the late case:

"Thus it will be seen, in a case of this sort, upon a *prima facie* case being circumstantially made calling upon the person charged with fraud to explain his conduct, there still stands the presumption against wrong doing, eclipsed for the time being by the adversary presumption, but, subject to be efficiently aroused by affirmative evidence, direct or circumstantial, so satisfactorily explaining the adversary circumstances that they no longer seem to exist by clear and satis-

factory evidence.    In the end, upon the whole case, the cir-
cumstances from which the alleged undue influence is infer-
able as matter of law must stand upon such evidence.    That
is, the burden being upon the one charging undue influence,
from first to last, to establish it by clear and satisfactory evi-
dence, the rule goes to the existence of the circumstances; the
effect of the circumstances is matter of law.    Weaken the
case as to any one of the vital major incidents so that it can
no longer be said to exist by clear and satisfactory evidence;
then the *prima facie* case once created is so far rebutted that
the plaintiff cannot successfully stand thereon, but must go
further."    *Ball v. Boston,* 153 Wis. 27, 37, 141 N. W. 8.

There is another important feature of the trial court's logic
which seems to be contrary to the settled doctrine of this court.
It is suggested that this court has never laid down any par-
ticular conditions which must be proved in a case of this sort;
but, on the contrary, it has been decided that it is impossible
to formulate a precise rule by which to decide the facts in all
cases, citing *Winn v. Itzel, supra,* and drawing the conclusion
therefrom that affirmative proof of a disposition to exercise
undue influence is not vital.    The trial judge seems to have
overlooked the fact that in the *Winn Case* after the treatment
upon which he relied, this rule, laid down in *Fox v. Martin,*
104 Wis. 581, 80 N. W. 921, and many times since reiter-
ated, particularly in *Loennecker's Will,* 112 Wis. 461, 88
N. W. 215, was approved:

"There must be shown a subject unquestionably susceptible
to undue influence, either as the result of old age, mental
weakness, or both; also some clear evidence of opportunity,
and a disposition on the part of the beneficiary to exercise
such influence,"

in order to raise the presumption of such exercise and call
upon the defendant to so far weaken it, at least as to destroy
efficiency to establish the ultimate fact.

It must follow that to warrant such a result as was reached
here as to undue influence, the fact of susceptibility to such
influence must be left at the end of the trial unquestionably

established, and the disposition to exercise such influence established by clear evidence. Those terms have been so repeatedly used in the decisions of this court as to clearly make a rule on the subject involved.

The very nature of such cases as this indicates the prime essential to a recovery. It is grounded on fraud, and fraud of a very serious character. *Will of Slinger*, 72 Wis. 22, 37 N. W. 236; *Small v. Champeny*, 102 Wis. 61, 78 N. W. 407; *Ball v. Boston*, 153 Wis. 27, 141 N. W. 8; *Gordon v. Burris*, 153 Mo. 223, 54 S. W. 546; *Grove v. Spiker*, 72 Md. 300, 20 Atl. 144. This court, speaking of the wrongful act, said in *Will of Slinger*:

"Manifestly it is a subtle species of fraud, whereby mastery is obtained over the mind of the victim by insidious approaches, seductive artifices, or other species of circumvention;"

and in *Ball v. Boston, supra*:

"It is, really, one of the most reprehensible of deceptions because of the cunning, insidiousness, and artifices of seduction, which, in general, characterize it, and by means of which the unsuspecting victim is rendered powerless to carry out his own wishes or resist those of the wrongdoer."

Now if the basic feature of the case is fraud, and fraud in a high degree, and therefore particularly inconsistent with the general presumption against wrong doing, why does not the ordinary rule of clear and satisfactory evidence, in cases dependent on the establishment of fraud, apply,—not only apply, but quite emphatically? Generally, the more serious the nature of a wrong the stronger is the presumption of innocence of it, so the higher the degree of certainty required to overcome it. So, in ordinary cases, proof of the facts to a reasonable certainty is sufficient. In cases sounding in fraud, proof of the facts with that degree of certainty is required, emphasized by the call for clear and satisfactory evidence; and where the wrong is of such serious nature as to

involve the commission of an offense against the public, the degree of certainty must be such as to leave no reasonable doubt.    How then can we escape the conviction that a charge involving such a subtle species of fraud as the robbery, so to speak, of a person by "insidious approaches, seductive artifices, or other species of circumvention,"—the deliberate act of singling out a victim for impoverishment and, by such reprehensible means as indicated, rendering him powerless to carry out his own wishes or resist those of the wrongdoer,—in order to prevail must be established by clear and satisfactory evidence?    If that term has not been used so as to make plain the pathway of the trial judge and the logic of the decisions here, I am utterly unable to see why it is inappropriate; moreover, is not entirely appropriate.    It was used either in words or effect before *Ball v. Boston.*    I think it is the logical, necessary deduction from many decisions on the subject.

I enlarge upon the matter above discussed because I believe that such an important feature of the law should not be left in any degree of uncertainty.    In *Ball v. Boston,* after referring to many cases at home and abroad on the subject, it was said advisedly:

"Thus it will be seen, in a case of this sort, if there is failure to appreciate that the gist of the attack upon the will is fraud, and the rule applies that he who alleges fraud must establish it,—not by a preponderance of, but by clear and satisfactory evidence,—the finding as to the vital fact is liable" to be wrong because of having been reached without proper legal guidance.

Probably the logical result of classing obtaining property by the exercise of undue influence with wrongs sounding in fraud, so that cases depending upon proof of such a wrong should be tested by the common rule on the subject, was first definitely stated in *Ball v. Boston;* but special reference was there made and is here repeated, to the fact that the first

prime essential,—a subject susceptible to undue influence,—must be unquestionably established, and the other two, viz.: opportunity and a disposition to exercise undue influence, must be established by clear evidence. It seems that a fact cannot be unquestionably established without being established by clear and satisfactory evidence, nor the other two essentials by clear evidence, without that including clear and satisfactory evidence. So it was said in *Ball v. Boston:*

"The burden being upon the one charging undue influence, from first to last, to establish it by clear and satisfactory evidence, the rule goes to the existence of the circumstances. The effect of the circumstances is matter of law."

That the trial court did not understand the law as above indicated, becomes quite clear by testing the findings of fact by the evidence, and is rendered unmistakable by language found in the opinion. What else can the suggestion mean to the effect that this court has not laid down any precise conditions essential to the finding of efficient undue influence in a case of this sort, in face of the fact that several conditions have been held, time and again, to be vital? Furthermore, what else can the statement by the learned judge mean, to the effect that this court has not laid down, as a rule, that there must be affirmative proof of disposition on the part of the beneficiary to exercise such influence? We must assume that the trial judge did not mean by the term "affirmative proof," direct evidence, but did mean that the suggested disposition on the part of the beneficiary to exercise undue influence, need not be affirmatively established; or in other words, established by a preponderance of the evidence. The word "affirmatively" is somewhat ambiguous, but where used in the particular connection in question, it has been held to convey the idea of evidence establishing the fact in dispute by a preponderance of the evidence. *Hendrickson v. Wis. Cent. R. Co.* 143 Wis. 179, 122 N. W. 758, 126 N. W. 686.

Further, after suggesting that no particular essential cir-

cumstances need be established in a case of this sort, and that
affirmative evidence of disposition to exercise undue influence
is not necessary, in all cases, the learned court expressed the
opinion that "cases might arise—and I believe this to be
one—where the situation is such that there would be an in-
ference of fraud, even though there was no express testimony
of disposition on the part of the beneficiary to do a wrongful
act." Thus making plain that this case was not decided
upon the theory that there was clear evidence, affirmatively
establishing a disposition on the part of appellant, or any one
acting for him, to exercise undue influence. True, the term
"affirmative evidence" was used in one place, and the term
"express evidence" in another; but it seems quite plain, the
judicial idea was that "a disposition to use undue influence"
need not, in all cases, grounded on that species of fraud, be
established affirmatively; that is by clear and satisfactory
evidence, and that this particular case is one of the exceptions.

In view of the foregoing, it is considered that the trial
court, in reaching a conclusion, did not deem it material to
find that Mr. Svenson was unquestionably susceptible to undue
influence, nor that a disposition on the part of appellant to ex-
ercise such influence should be, or was, established, even to a
reasonable certainty. In other words, that evidence per-
suasively tending to show the alleged victim to have been
susceptible to undue influence, and something not answering
at all to the call for clear evidence of a disposition on the part
of the beneficiary to exercise undue influence, is sufficient in
exceptional cases such as this.

Thus, in three material respects the decision complained of,
is characterized by misapplication of law to evidence. That,
necessarily, greatly, if not entirely displaces the presumption
which, in general, renders judicially found facts immune
from efficient attack, and requires us to go to the evidence and
endeavor to determine, from an original standpoint, whether
it warrants the conclusions which are challenged.

The requirement that there must be evidence showing a subject unquestionably susceptible to undue influence bears strongly, if not vitally, on the element of incompetency, since, in general, one could hardly be the former without being the latter, nor be the latter without being the former.    Moreover, one to knowingly become enriched by dealing with an incompetent person, to the impoverishment of the latter, would be guilty of a fraud, akin to one, if not actually, characterized by undue influence.

Now, where is the evidence showing that Mr. Svenson was unquestionably susceptible to undue influence when the transfer was made to appellant, or was unquestionably or clearly incompetent?    After reading the evidence in the record with all the care we can bestow upon it, we cannot answer that question.    There may be evidence, direct or circumstantial, or both, affording fair ground for suspicion as to existence of the vital weakness; but that would be the limit.

The burden of proof being on respondent in respect to the matter, it was necessary for him to produce evidence of a substantial, forceful, and convincing character and which possessed that character in the face of the adverse proof, in order to warrant a finding in his favor.    The evidence indicates that Mr. Svenson possessed characteristics common to men of his age and station who, having permanently laid aside all thought of taking further part in the activities of life to earn the means essential to care of themselves and family, in contemplation of inactivity for a few years and then death, may settle, or practically so, upon a plan for their remaining years, and are merely waiting for the last call, yet have retained full control of their property and business.    Such little circumstances, in such a situation, as waiting to be spoken to upon neighbors calling, especially in case of difficulty of hearing, if characterized by a prompt and intelligent response, as is quite clearly established here was the case, notwithstanding some little evidence to the contrary, weigh

very light. And so with the circumstance of being a little childish,—as that term is commonly used by young or middle-aged persons, in speaking of old people who have gotten into the period and condition sometimes spoken of as second childhood; that is where one, on account of age, has lost the assertiveness and self-helpfulness of former days,—so long as there is still full appreciation of surroundings and possessions and the individuality requisite to take care of one's property and business. And so with evidence of such circumstances as occasionally forgetting names, or faces, or confusion as to just the way to return home upon being absent therefrom, so long as there still remains, as in this case, up to the time of the transfer, capacity to conduct ordinary individual business and such capacity is exercised. The fact that the deceased gave his property to appellant, as representative of his daughter, to whom he evidently was more affectionately attached than any other of his children, instead of dividing it between all, has nothing unnatural about it, when viewed in the light of all circumstances bearing on the transaction. He had a right to do with his own what he had a mind to. His children had no rights in the matter at all, except to have him left free to act intelligently upon his own judgment and without coercion. They were specially interested in that regard, but the right, in general, was no greater as to them than to society at large. There is the high place, in contemplation of the fundamental principles of civil life, which the right of individual liberty to dispose of one's property by contract or will,—holds. It is not the business of courts to undo what an old person may have done with his property, because of judicial notions of propriety or moral obligation, in a case of this sort, or the wishes of relatives, however deserving. Did the man do freely what he wanted to do and was competent to decide upon? Those are the sole questions. They being answered in the affirmative, it ends the matter, whether the disposition be such as would seem to have been the best

from a business or moral standpoint, or not.   Such situations should not be so dealt with as to render it impossible, or even difficult, for an old person, circumstanced as Mr. Svenson was, to freely contract for support and care for the remainder of his days and for a decent burial at last, or render it unsafe to contract with him in respect thereto.   Certainly, there is no more legitimate or commendable way for an old person to use the small fund accumulated by a long life of industry, than to devote it to securing proper care and support in his last days and the proper disposition of his remains at the end.

The amount of property here was not large.   It was no more than an old man, circumstanced as deceased was, might well consider he could afford to give to be able to live in comfort,—free from all care, with every reasonable requirement for his welfare, the balance of his days, provided,—under the roof of a daughter whom he loved and who loved him and between whom there were relations, special, as regards his other children, and be assured a decent burial at the end.   Especially is that so, in view of the fact that his other children, except one, were far away, had been absent for many years, had family relations of their own and did not need any assistance from him, and that one had not lived with him since his thirteenth year, a period of some twenty-five years. There is nothing in the case to indicate that the absent children paid any special attention to their father during the years which elapsed between the death of his wife and his own decease, or that he thought he was not perfectly competent to handle his own affairs, even to the extent of using his little estate, and the whole of it if necessary, to secure care in his old age.

The idea expressed by the trial judge that the agreement made for support was a grossly inadequate consideration for the property appellant received from the deceased, must have been made from the viewpoint of the result of the contract, instead of from that which was within reasonable probabili-

ties when the transaction occurred. Mr. Svenson's expectation of life, then, was between five and six years, with probabilities of all the vicissitudes which are common to old persons, often creating conditions almost impracticable to efficiently cope with by use of a money consideration. The fact that the extreme did not occur in this case, makes no difference, in looking at the matter from the standpoint of the parties when the contract was made. It must be presumed that they had in contemplation everything which might, in any reasonable probability, occur, and also in contemplation the special value which the filial attention of a daughter and special attention of her husband on her account, if not of his own regard for the aged man, might be to the latter.

It seems hardly possible that the trial judge could have looked, prospectively, from the standpoint of the parties when the contract was made, when he indulged in the idea that the property transferred was grossly disproportionate to the consideration received. The deceased, evidently, thought that there might not be much left, in the end, out of his little property,—probably not enough to be of any considerable account, divided into four parts, and so, without meaning any slight to his absent children, he determined to give all to the one who had been nearest to him,—the one to whom he turned when necessity compelled him to seek for a home away from his own place,—the one who took him in and had been kind to him, and on whom he relied for future care and such kindness as only a daughter is likely to bestow—and was very decided about it.

When it comes to matter of clear evidence of a disposition to exercise undue influence over the deceased, we are at a loss to find any. On the contrary, there seems to be very clear direct evidence that no such disposition existed. There is no question but what the one called in to act as legal adviser and the one who was called to be a witness were reputable men. Mr. Anderson, who attended to drawing the papers and ad-

vised in respect as to how the transfers should be made, appears to have been a very considerate man of experience, who appreciated that, on account of Mr. Svenson's age, it was advisable to proceed with deliberation and to be reasonably sure of his having a full understanding of what he had and that to transfer all for the benefit, in effect, of one child might lead to difficulty with the others, unless he, clearly, acted freely and intelligently in the matter. So, some two hours were taken in doing the business which might, under some circumstances, have been done in half an hour. Each particular note or certificate of deposit was taken up and only disposed of when Mr. Anderson was satisfied that Mr. Svenson appreciated just what it was. His mind was turned, time and time again, by appellant and his wife to the subject of favoring his absent children by bestowing upon them some of the property; but he declined to do so, showing some irritation upon being pressed to consider the matter after letting it be known that he had made up his mind what he wished to do. At the last, in order to make sure that Mr. Svenson had acted of his own free will, Mr. Anderson, in the presence of the witness, appellant, and his wife, said to the old man: If at any time you are dissatisfied with what you have done, let me know and I will return and we will do it all over.

The circumstance of Mr. Svenson so emphatically declining to reserve any property for his absent children as to give the impression that he was irritated by the suggestion that he should do so, is not very significant. When viewed in its proper light, there seems to be no clear foundation in the evidence for the conclusion that Mr. Svenson was either incompetent or acted under undue influence. His final declination, with some show of irritation, to reserve any property for the absent children, instead of indicating that he was in an abnormal condition or under undue influence, seems to evidence the contrary. The whole transaction shows that he

knew just what he had, that he appreciated he had another daughter and two sons, but had so firmly made up his mind to what he wished to do that, when treated as if, possibly, he did not appreciate what he was doing or that what he had determined to do might not be considered right, he resented it. His manner was indicative of his being a resolute old man who had deliberately formed a design in regard to his property, and did not want any advice from any one as to his duty, or the propriety of his act, and would not brook any interference.

That the manner of Mr. Svenson, as indicated, fairly evidences a deliberate plan of disposition of his property, is corroborated by evidence of occurrences before the transfer. Such occurrences also show there was no thought on the part of appellant of preventing Mr. Svenson's absent children from counseling him, if they desired to do so, in respect to his care in old age and the disposition of his property. In this connection, it is considered, that the evidence of appellant's wife that she, by his direction, repeatedly informed her brother Sievert by letter, that her father desired to make a full disposition of his property, either to her and her husband or to some institution, to secure his future care, which was taken under objection, should have been considered. She obviously was agent for appellant in writing the letters. There can be no doubt about that. If, by letter, appellant and his wife informed Sievert, as is claimed, it is very persuasive against the claim of undue influence and incompetency as well. The evidence is, practically, undisputed that correspondence was had between appellant's wife and Sievert, several letters passing, and that, in those letters, he was informed that his father wanted to make a final disposition of his property. She testified very positively in respect to the matter. He testified in a somewhat contradictory and uncertain way, as if he had no definite remembrance as to what was written to him. On the whole, his evidence shows that

he, at least, was informed by appellant's wife that his father wished to make a disposition of his property of some kind. Under the circumstances, he must have supposed that his sister would be at last a favored beneficiary. It is quite probable that he was made fully acquainted with the wish of his father to convey his property to some person or institution to secure his future support, just as Mrs. Lorentzen testified.

In connection with the fact that Mr. Anderson admonished Mr. Svenson, after the transfers were all made, that if at any time the latter should be dissatisfied with what he had done, to let the former know and he would come out and fix the matter over again, it is significant that, though Mr. Svenson was substantially in full possession of his faculties for a year, more or less, thereafter, he did not by act or word show any desire for any change. The old man's mental condition, some two months after the transaction in question, is indicated by the circumstance that, when the pastor of the church to which appellant and his wife belonged, called at the house, he talked intelligently and thought to send greetings to the pastor of his own church. There are ample indications in the record that the deceased, for months after the particular transaction, was fully competent to reconsider it and express dissatisfaction therewith and was free to do so if he desired, yet he gave not the slightest sign in that regard.

Without pursuing the subject discussed further it seems that enough has been said to show that the evidence, from the viewpoint of right rules of law, does not support the findings and that, had the trial court looked at the matter from such viewpoint, the result would have been different.

*By the Court.*—The judgment is reversed, and the cause remanded with directions to dismiss the same with costs.

BARNES, J. (*concurring*). I agree in the result. For reasons stated in *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8, I do not agree in all that is said in the opinion.