McMillen, Respondent, vs. Strange, imp., Appellant.

*November 18, 1914—January 12, 1915.*

*Appeal: Review: Findings of fact: Evidence: Sufficiency: Sale of corporate stock: Fraud of purchaser: Confidential relations: Overreaching: Contracts: Construction: Retention by party: Estoppel.*

1. Conclusions of fact reached by wrong application of legal principles do not fall within the rule which prohibits this court from disturbing the trial court's findings of fact unless they are against the clear preponderance of the evidence.

2. The fact that one stockholder in a corporation, in negotiating for the purchase of the shares of another stockholder toward whom he sustained confidential relations, made strong representations relative to the lack of integrity and the extravagance of the persons in control of the corporation and the ruinous results which were likely to follow from a continuance of their management, does not justify a finding of fraud in the purchase, where he acted in good faith and honestly and fully believed what he said was true, even though he had exaggerated ideas as to the impending danger.

3. The evidence in this case is *held* not to sustain findings of the trial court to the effect that defendant took advantage of confidential relations existing between himself and plaintiff and by overpersuasion and overreaching induced her to sell certain corporate stock to him; but, on the contrary, to show that in such purchase defendant dealt fairly and honestly with plaintiff and was guilty of no overreaching, unfair, or unconscionable conduct.

4. A contract providing for the purchase of corporate stock, to be paid for within eight years, that it should be held in escrow until paid for, that the dividends should be paid to the purchaser but should be used to pay interest on the purchase money, and that in case of default in making any payment of principal or interest

the agreement should become void, the deposit be terminated, and the stock returned to the vendor, is construed as giving the vendor an option to declare the contract void in case of default, or to enforce it and collect the purchase price, as she might choose.

5. A privilege reserved in such a contract to pay the entire purchase price before the expiration of the time limited therefor, is not an unusual provision, nor can it be said to be unfair or unconscionable toward the vendor.

6. The law will not permit a person capable of understanding a contract to sign it, retain it, and afterwards avoid it upon the pretext that it was not understood.

APPEAL from a judgment of the circuit court for Winnebago county: W. B. QUINLAN, Judge. *Reversed.*

This action was brought to set aside a sale by the plaintiff to the defendant *John Strange* of 250 shares of the capital stock of the Fox River Paper Company of the par value of $25,000, on the ground of alleged fraud on the part of the defendant *Strange.* The Fox River Paper Company is a Wisconsin corporation engaged in the manufacture and sale of paper at Appleton, Wisconsin. The complaint charges that the plaintiff was induced to make the contract of sale by the false and fraudulent representations of the defendant *Strange* and by undue influence exercised by him upon the plaintiff. The material allegations of the complaint are put in issue by the answer of the defendant *Strange.*

The court below rendered a decision in writing reviewing the evidence and giving its conclusions respecting the facts, and also made findings of fact and conclusions of law.

The contract of sale between the plaintiff and the defendant *Strange,* dated August 4, 1913, provided that the plaintiff sell and deliver her stock in the Fox River Paper Company for $25,000, and that the defendant *Strange* agreed to pay therefor $25,000 on or before eight years from the date of the contract, with interest at six per cent. per annum, payable quarter-annually, and contained the following provisions,

designated in the decision of the court as paragraphs VII and VIII:

VII. "It is further agreed that all dividends accruing and declared upon such capital stock while same shall be held in escrow as aforesaid, shall be payable to said *John Strange* or his legal representatives, heirs or assigns, but shall be applied by him or them, first, to the payment of the interest accruing and due upon the sums owing and to be paid as aforesaid, and any surplus thereof as he or they shall direct."

VIII. "And it further is agreed that in case of default in the payment of such interest at the times herein stated or in default in the payment of said principal sum as agreed herein or in any of the agreements hereof, this agreement shall be and become void, and said deposit shall thereupon be terminated and said certificates of stock and the instruments of assignment thereof shall become void and shall be surrendered to said *Alice McMillen,* her legal representatives, heirs or assigns."

The contract further provided that the purchase price, principal and interest, was secured by the holding of the stock in escrow by the Oshkosh Savings & Trust Company, defendant herein; that upon the execution of the contract of sale the plaintiff was to make and execute instruments of assignment and transfer of the shares of the capital stock and deposit the same in escrow with said Oshkosh Savings & Trust Company, defendant herein, together with a duplicate of the contract of sale to be held by said Trust Company until the full amount specified in the contract of sale with interest had been paid, and upon payment the stock with the instruments of assignment were to be delivered to the defendant *Strange,* and said *Strange* be thereafter fully discharged of all claims of the plaintiff on account of said purchase money and interest; that the plaintiff was also to execute and deposit with the stock certificates and instruments of assignment proxies authorizing the defendant *Strange* or his legal representatives to vote the shares of stock so deposited at all meetings

of the stockholders of said Fox River Paper Company, and that said proxies should not be revocable during such period of escrow, and that a duplicate of such proxies be delivered to defendant *Strange* and a like duplicate to the Fox River Paper Company.

The court below found that the plaintiff, when the contract was made, owned the stock in question, which was of the par value of $100 a share, and had owned it since 1901; that in 1899 Katherine, daughter of defendant *John Strange,* married Robert McMillen, Jr., son of plaintiff, and thereafter the plaintiff and her said son and daughter-in-law lived together as members of one family in the plaintiff's home for seven years, and because of said family ties there grew up between plaintiff and the defendant *John Strange* close confidential relations; that as a result thereof defendant *Strange* became the confidential adviser and trusted friend of the plaintiff and her son Robert McMillen, Jr., and plaintiff acted upon defendant *Strange's* advice in making the investment in said 250 shares of stock, and thereafter she depended upon him for information concerning the affairs of the Fox River Paper Company; that the defendant *Strange,* before he became stockholder in the Fox River Paper Company, attended the meetings of the stockholders with his son-in-law, Robert McMillen, Jr., who was an officer and director of the company, and in an advisory capacity took part in the affairs of the company; that after the death of said Robert McMillen, Jr., and about the year 1906 the defendant *Strange* became a stockholder and director of the Fox River Paper Company, and continued as such director until July, 1913, and during said time plaintiff depended upon him for information relating to the affairs of the company; that said company was engaged in the manufacture and sale of paper at Appleton, Wisconsin, and doing a profitable business, and for more than ten years immediately preceding the commencement of this action had declared and paid quarterly divi-

dends to its stockholders out of the net earnings; that plaintiff received and was paid annually upon her 250 shares of stock between 1901 and 1912 inclusive dividends ranging from $1,500 to $3,000 a year, or about on an average of approximately ten per cent. a year; that the Fox River Paper Company during the time that defendant *Strange* was a director maintained a policy to pay out of the net earnings to its stockholders quarterly dividends amounting in the aggregate to not less than eight per cent. per annum, and during all of said time there was paid annually to its stockholders in quarterly dividends a sum in excess of eight per cent. per annum; that the affairs of the company were so arranged as to keep on hand out of the net earnings a surplus sufficient to declare at least a quarterly two per cent. dividend regardless of business conditions which for any particular quarter might show a loss, or little, if any, profit, all of which defendant *Strange* knew at and prior to August 4, 1913; that the authorized capital stock was $550,000, divided into 5,500 shares of the par value of $100 per share; that 5,406 shares have been issued and are outstanding and the remaining ninety-four shares are held in the treasury; that the value of the assets and property of said company as shown by the books is $1,175,000; that the company is solvent; that it has an enviable reputation in the business world; that the good will is valuable; that the mills belonging to the company are being operated profitably; that since the commencement of this action the regular quarterly dividend of two per cent. has been paid; that in July, 1913, and prior thereto, and on August 4, 1913, and since the shares of stock had a book value of $166 per share, and at said times the cash sale value of said stock was not less than $120 per share, all of which was known to the defendant *Strange;* that prior to the July, 1913, annual meeting of the stockholders there arose some matters of difference between employees, superintendent, and officers; that defendant *Strange* as director advocated changes in the man-

agement and policy of the company, and at the July, 1913, annual stockholders' meeting he was by vote of a majority of the stockholders defeated as a director; that the changes in directorate at the July, 1913, annual meeting had up to the time of making the findings in no manner injured the company or the value of its stock.

"That the defendant *John Strange* and W. D. Whorton, a director, had been on friendly and intimate terms, and upon the solicitation and request of the defendant *John Strange* the said Whorton wrote to the plaintiff, *Alice A. McMillen,* the letter of July 15, 1913, identified as Exhibit 'A.'

"That on August 1, 1913, and at a time when the plaintiff, because of illness, was in a weakened physical and mental condition and susceptible to the defendant's influence, he took occasion to call at her home, his object and purpose being to secure by personal solicitation and persuasion from this plaintiff her said shares of stock in the Fox River Paper Company, he well knowing that plaintiff regarded said stock as a safe investment and that she had faith and confidence in the business of said company and in the treasurer and general manager of said company, Mr. H. G. Freeman, and well knowing that plaintiff had no desire to sell the same, and that it was not for sale; that plaintiff desired to keep said stock for her three daughters, and that provision had been made that it should ultimately go to plaintiff's said daughters.

"That defendant then and there, in order to induce the plaintiff to surrender said stock to him, and with full knowledge that if he succeeded he would prevent said shares of stock from going where the plaintiff had ultimately designed it should go, took advantage of the friendly and confidential relations then existing, and by overpersuasion and by overreaching on his part, and by reason of the trust and confidence which the plaintiff had reposed in him, induced the plaintiff to agree to let defendant have her said shares of stock.

"That by reason of the defendant's overreaching conduct, and by reason of such confidential relations, he succeeded in producing in plaintiff's mind impressions concerning the condition of the Fox River Paper Company and the necessity for the success of said business that the defendant be in control of the affairs of the company or upon the board of directors.

"That the defendant exaggerated the importance of the differences between the directors and their effect upon the future success of the company's business; that he represented that the affairs of the Fox River Paper Company were being mismanaged and that salaries far in excess of what were just were being paid to the officers; that the business was going to ruin; that the general manager, Mr. H. G. Freeman, was not earning his salary; that he was at the office of said company attending to business only two hours a day; that Mr. Wagg, the superintendent, was getting an excessive salary, and that he was a thief; that one of Mr. Wagg's sons was drawing a salary of $5,000 a year; that the earning powers of the property were greatly impaired and that there would be no dividends on said stock in the future; that the value of said stock would depreciate until it would be worth but fifty cents on the dollar, and in consequence thereof Katherine McMillen and plaintiff's grandson, Bobbie, would sustain great financial loss.

"That all of the foregoing statements so made to the plaintiff were misleading, and that they created in the plaintiff's mind unnecessary alarm and fear, and because of her weakened and impaired mental and physical condition her judgment was thereby unsettled and she did not have the full and free use of her reasoning faculties and was unable to comprehend fully the transaction, and that through the fear and alarm produced, and believing that the safety of her grandson Robert's and her daughter-in-law Katherine's investment in the stock of the Fox River Paper Company would be greatly impaired and that there was grave and serious danger of financial ruin to them, she carried out the promise so secured by the defendant *John Strange* and executed on August 4, 1913, the agreement and delivered the stock therein mentioned to the Oshkosh Savings & Trust Company.

"That the plaintiff at said time lived in her home in the city of Oshkosh alone with her maid servant, and had always relied upon Mr. George Hilton, an attorney at law of Oshkosh, Wisconsin, to give her advice on business matters, and that she had no acquaintance with any other lawyer in the city of Oshkosh or elsewhere.

"That the plaintiff entered into said contract without taking independent counsel or advice, and that the same was not fully understood or comprehended by her.

"That the value of said shares of stock was upwards of $30,000.

"That the defendant paid plaintiff nothing whatever, either in cash or property, for said stock, and before the commencement of this action she demanded its return.

"That the plaintiff left with the defendant *John Strange,* by reason of such confidential relations, the procuring of a competent attorney who was to prepare such contract for the sale and delivery of said stock in terms that would be perfectly fair between the parties, and relying upon such relationship she assumed that a contract in accordance with such fairness had been prepared.

"That instead of presenting such a contract to the plaintiff for her signature, the defendant *John Strange* presented a contract to her which was unfair, one-sided and unconscionable, and failed to explain such contract and all of the provisions therein contained, so that when the plaintiff signed the same she did not fully understand the contents thereof nor the effect that certain provisions therein had upon her rights in the transaction."

Judgment was entered upon the findings in favor of the plaintiff, from which this appeal was taken.

For the appellant there was a brief signed by *Silas Bullard,* attorney, and *J. C. Thompson,* of counsel, and a reply brief and oral argument by *Mr. Thompson.*

For the respondent there was a brief by *Bouck & Hilton, E. J. Dempsey,* and *John F. Kluwin,* and oral argument by *Mr. Dempsey* and *Mr. Kluwin.*

KERWIN, J.   Many of the material facts in this case are without substantial dispute.   The main controversy arises more particularly upon conclusions drawn from facts proved than upon disputed questions of fact.

Where a trial court finds the facts, or the facts are undisputed, and follows such findings or undisputed facts with conclusions contrary to what is legitimately deducible from such facts, to the effect that there was a fraudulent transaction, such conclusions are open to attack and reversal when the con-

clusions are not properly deducible from the established facts. Conclusions of fact reached by wrong application of legal principles do not fall within the rule which prohibits this court from reversing findings of fact unless against the clear preponderance of the evidence. *Figge v. Bergenthal,* 130 Wis. 594, 109 N. W. 581, 110 N. W. 798.

The learned trial court concluded in its findings of fact that the defendant "took advantage of the friendly and confidential relations then existing, and by overpersuasion and by overreaching on his part, and by reason of the trust and confidence which the plaintiff had reposed in him, induced the plaintiff to agree to let defendant have her said shares of stock." The court below in its decision and upon sufficient evidence acquitted the defendant of any wilful or active fraud, and unless the established facts show that he was guilty of a constructive fraud the judgment below cannot be sustained.

It appears from the record without substantial dispute that Robert McMillen, known in the record as Robert McMillen I, died in 1887, and that his adopted son, known as Robert Mc-Millen II, and George Hilton, an attorney of Oshkosh, Wisconsin, with others since deceased, were named as executors of the will of Robert McMillen I. Robert McMillen I left stock in the Fox River Paper Company of the par value of $200,000, and left surviving him his widow, the plaintiff, and his son Robert McMillen II, and an adopted daughter, Jessie Edmundson, who has two daughters. The Fox River Paper Company operated paper mills at Appleton, Wisconsin; the first was built in 1882, the second in 1888, and the third in 1893. The authorized capital stock of the company was $550,000, $540,000 outstanding and the balance in the treasury. Twenty-five thousand dollars par value of the stock was left under the will of Robert McMillen I to his executors in trust and is held by Mr. Hilton as surviving executor in trust for the adopted daughter, Jessie Edmundson. In the settlement of the estate in 1889 the plaintiff took $25,000 par value

of the stock of said company from her husband's estate at par; Robert McMillen II received stock of said company of the par value of $141,000. This stock up to 1889 had never paid a dividend, but thereafter and in 1900 paid a dividend of one and one-half per cent. Robert McMillen II succeeded his father as president of the company and married Katherine, the daughter of defendant. Robert II had the advice and services of the defendant, who was experienced in the paper-mill business. Robert McMillen II at his death in 1906 left him surviving his widow, Katherine McMillen, and one son, designated in this case as Robert McMillen III and sometimes called "Bobbie," who is about eight years of age. The defendant is executor of the will of Robert McMillen II. Katherine McMillen holds the $141,000 capital stock of the Fox Rixer Paper Company formerly held by her husband and 150 shares since purchased, and defendant holds in his own name 87 shares and his son Paul 44 shares. After the death of Robert McMillen II the defendant was elected a director of the company, and from 1900 the company paid dividends averaging a little over ten per cent. annually. The company's statement for 1913 shows a surplus account of $225,000, which with the profit and loss account made the book value of the stock over one and one half of par. The company, however, failed to carry any depreciation account until 1909, when it was decided that a proper yearly depreciation was about $25,000, and in 1909, 1910, 1911, and 1912, as appears from the statement of October 1, 1913, the company charged off a depreciation of $98,650. According to the statement the book value of mills and machinery was about $615,000, so it appears that if proper depreciation had been charged off from the time of completion of the last mill built in 1893 down to 1909 the books would show very little surplus. In 1912 and 1913 the first mill, built in 1882, was considerably out of date so far as its capacity to compete with modern mills was concerned; a new filtration system was

necessary, and for the three mills would cost between $50,000 and $100,000. Mr. Wagg was superintendent and director of the company and Mr. Freeman manager and director. Superintendent Wagg's son was in the employ of the company, and trouble arose with regard to the sale of rubber rags which Wagg's son was purchasing by the carload and selling to the company largely in advance of the market prices. Mr. Whorton, a stockholder, was at this time president of the company, and, after an investigation brought about through defendant, demanded the resignation of Mr. Wagg and his son. The matter was referred to a committee, which at the time of the trial had not reported.

There was evidence going to show that the so-called rag deal was a very substantial loss to the company, although this was denied by Freeman. There was also evidence that the company was selling paper below cost, and that if the same price had been made to all customers that was made to one, there would be a net loss of $40,000 a year. At the July, 1913, meeting the defendant offered resolutions for the purpose of putting the property into shape for successful operation and to provide funds and to adopt a proper system of accounting, and proposed a cutting down of dividends in view of the company's need of new improvements. A mortgage securing a bond issue of $250,000 was authorized. The company's statement of October, 1913, shows $108,000 bonds outstanding, bills payable $111,100, accounts payable over $33,000, labor and salary over $10,000. In April and March, 1913, Wagg sold 150 shares, being all of his stock except six shares, at $120 per share. There is evidence that he formerly offered it at par. It also appears that, allowing a proper amount for depreciation, the profits for 1913 would be very small, if anything. The stock controlled by the defendant, aggregating about $170,000, together with 288½ shares held by the president, Whorton, and 285½ shares held by his stepmother, and the plaintiff's 250 shares, were voted for defend-

ant, but the stock controlled by Mr. Hilton as trustee for Jessie Edmundson, together with other stock, was voted against the defendant at the July, 1913, meeting, and he was defeated as a director. So it appears that the balance of power of stock at the stockholders' meeting rested with the plaintiff and her adopted daughter, Jessie Edmundson. At this meeting the following directors were elected: Mr. Hilton, whose interest in the company was only that of trustee of Jessie Edmundson's stock; Mr. Wagg, who held but six shares; Mr. Freeman, who held 150 shares, which shortly thereafter he sold to one Wing, who had had but little experience as a practical paper-mill man, but was at the time of trial getting a salary of $4,000 as assistant manager; and Mr. Morrison, who held but one share, his wife, however, owning 250 shares. Mr. Whorton was also elected, but refused to serve as director on account of the defendant being defeated. After Mr. Whorton refused to serve Mr. Witter was elected president. Mr. Witter is interested in paper mills and banks at Grand Rapids, Wisconsin, and it does not appear from the record that he was giving much personal attention to the business of the Fox River Paper Company. Mr. Freeman's salary was reduced from $5,000 to $2,500 after he sold his stock to Wing. The defendant was an experienced paper-mill man and obviously felt that his removal from the board of directors was not in the interest of the company. It was the understanding between plaintiff and defendant that the latter should report from time to time to plaintiff the affairs of the company, and he did so report to her the result of the July, 1913, meeting and his defeat as a member of the board of directors. After this July, 1913, meeting at which he failed to be elected as a director, defendant applied to the plaintiff to purchase her stock.

Plaintiff desired that Mr. Hilton vote her stock and that of Jessie Edmundson for defendant, and had he done so defendant would have been elected a director. Hilton voted

plaintiff's stock for defendant, but voted the Edmundson stock against him. The defeat of defendant left the stock held by him and his relatives, aggregating about $170,000, unrepresented upon the board of directors. The Whorton interest above referred to, aggregating 574 shares, was also left unrepresented, since Whorton refused to act on the board after the defeat of the defendant *Strange.*

It is quite clear from the evidence that Whorton felt that the board of directors elected at the July, 1913, meeting would not successfully manage the business of the company and that in consequence thereof the stock would be greatly depreciated, and wrote a letter to plaintiff, at the suggestion of defendant, which letter is referred to in the findings as Exhibit "A." In this letter Mr. Whorton speaks in high terms of *Mr. Strange* and expresses surprise that he was voted out of the directory, and saying that at that time in particular *Mr. Strange's* services were needed on the board.

It is true the evidence shows that plaintiff did not wish to sell her stock and offered to give defendant voting power. He answered her by saying that in case of her death the stock might fall into hands unfriendly to defendant's interest. But plaintiff was friendly to the *Strange* interest and desired to protect it, and finally consented to sell the stock and the deal was made.

Now the question in the case is whether there is sufficient evidence to support a finding of fraud. That there was no wilful or active fraud is settled by the evidence and the decision of the trial court. Counsel for respondent make some claim that there was sufficient evidence to support a finding of wilful fraud on the part of the defendant. We have failed to find it.

A very lengthy argument is made by respondent's counsel on the confidential relation existing between plaintiff and defendant and the abuse of it by defendant. True, there was a confidential relation existing between them, and if defendant

by virtue of the trust and confidence which plaintiff put in him defrauded her he is answerable therefor.

The court below found that on August 1, 1913, the plaintiff because of illness was in a weakened physical and mental condition and susceptible to the defendant's influence, and that the defendant by personal solicitation and persuasion secured her shares of stock in the Fox River Paper Company, knowing that plaintiff regarded the stock as a safe investment; that she had no desire to sell the same, and by overreaching and overpersuasion on the part of defendant and the trust and confidence which she reposed in him was induced to sell; and that the defendant succeeded in producing in plaintiff's mind the necessity of defendant being in control of the affairs of the company or on the board of directors; that he represented that the affairs of the company were being mismanaged and that the salaries paid to officers were far in excess of what was just; that the business of the company was going to ruin; that Wagg, the superintendent, was getting an excessive salary and was dishonest, and that his son was drawing a salary of $5,000; that the earning powers of the property were greatly impaired and that there would be no dividends in the future, and that the value of the stock would depreciate until it would be worth but fifty cents on the dollar, in consequence of which Katherine McMillen and plaintiff's grandson, Bobbie, would sustain great financial loss; that the contract between plaintiff and defendant was not comprehended by plaintiff, was unfair, one-sided, and unconscionable, and the same was not explained to plaintiff, and that she did not fully understand it.

It may well be that defendant had exaggerated ideas as to the impending danger under the directorate elected in July, 1913, but if he was honest in his representations to plaintiff he was not only guilty of no bad faith, but was doing his duty as her confidential friend in reporting to her what he believed to be the truth respecting the affairs of the company.

That defendant was acting in good faith and believed what
he reported to plaintiff is clearly established by the evidence
and supported by the decision of the court below.    The trial
court said in its written opinion in the record:

"The defendant *Mr. Strange* is a man sixty-one years of
age, magnetic, with a commanding presence, keen, shrewd,
enthusiastic, pugnacious, and persevering; has had a varied
and broad business experience; stands high in the business
world of the state; has been successful in his undertakings
and is considered an authority in the paper-mill business, in
which he has devoted much of his time for at least the past
ten years; his honor or integrity heretofore, so far as the tes-
timony discloses, has never been questioned."

The trial court further said in its written opinion:

"Before concluding, however, I wish to add that I do not
think that *Mr. Strange* ever at any time meant to perpetrate
a wilful fraud on the plaintiff as to the consideration, or that
the statements made by him to plaintiff concerning the offi-
cers' conduct and financial condition of the corporation were
anything but what he himself thought were the facts, and that
his sole motive in the transaction was to secure the stock be-
cause he himself believed it necessary to protect the other
stock in which he was interested, but that in his enthusiasm
and anxiety to secure the stock from plaintiff he overreached."

The court below further said:

"*Mr. Strange* was considerably wrought up over his treat-
ment by the stockholders and the condition of affairs of the
corporation.    I have no doubt but what he felt and believed
everything he said was the truth, and from what has devel-
oped from the testimony I am of the opinion that much of it
is the truth; however, from the view I have taken of the
questions material to a final determination of the suit, it is
not necessary for me to determine whether the statements so
made were true or false.    It is sufficient that they impressed
themselves upon her mind."

We are satisfied from the record that the defendant acted
in perfect good faith in the representations which he made to

plaintiff regarding the affairs referred to and that much that he said was true, and that if any part was not true it was immaterial.

We therefore pass to the proposition, What overreaching or unconscionable conduct on the part of defendant appears in the record which is sufficient to justify the judgment below? It seems that the court below was of the opinion that the contract on its face was unconscionable on account of paragraph VIII set up in the statement of facts, on the ground that this part of the contract gave the defendant the right to suffer a forfeiture to occur, rendering the contract void, and then at his election refuse to perform. This point was pressed in the court below by counsel for respondent here and seems to have been looked upon with favor by the court. After referring to the part of the contract designated as paragraph VIII in the statement of facts the court said: "It is claimed on the part of the plaintiff that this contract is one-sided, inequitable, unfair, and unconscionable." The court then proceeds to define such a contract and says: "Every syllable of paragraph VIII was bristling with unconscionable provisions as to her rights in the transaction. Plaintiff was old, tired." The court below in its decision, in referring to paragraph VIII, further said that the contract gave to *Strange* "an option to buy her stock for eight years at six per cent., with no obligation on his part to take it, but to draw the dividends and do with them as he pleased, and he might at any time during that period default and she would have the stock back on her hands and he the profit to the extent of $1,500 per year if the stock continued to pay twelve per cent.; if not, in whatever sum it would exceed six per cent., and if it paid less than six per cent., or became worthless, or default was made, then turn back the stock." If this construction of paragraph VIII were correct, there would be force in the contention that the contract is unfair and unconscionable. But it is not. The paragraph was favorable to plaintiff, be-

cause it gave her an option to declare the contract void in case
of default or left her free to enforce it and collect the pur-
chase price.    *Shenners v. Pritchard,* 104 Wis. 287, 80 N. W.
458; *Meagher v. Hoyle,* 173 Mass. 577, 54 N. E. 347; *Can-
field v. Westcott,* 5 Cow. 270; *Chambers v. Anderson,* 51
Kan. 385, 32 Pac. 1098; *Wilcoxson v. Stitt,* 65 Cal. 596, 4
Pac. 629; *Cartwright v. Gardner,* 5 Cush. 273; *Sigler v.
Wick,* 45 Iowa, 690.

Complaint is made of the part of the contract designated
in the statement of facts as paragraph VII.    But with the
proper construction of paragraph VIII as before shown,
there can be no objection to paragraph VII.

The findings to the effect that the plaintiff, because of her
weak condition, was unable to understand the transaction,
and that the representations made by defendant created un-
necessary alarm in her mind; that the contract was not ex-
plained to or fully understood by her, was one-sided and
unconscionable, are against the clear preponderance of the
evidence.    There was nothing unfair or unconscionable in
the contract.    Paragraphs VII and VIII, properly construed,
were fair and unobjectionable.    Some complaint is made
about a provision in the contract which gave the defendant
the right to pay the whole amount before the expiration of
eight years, the limit given to make full payment.    This is
not an unusual provision nor one that can be said to be so un-
fair as to avoid the contract.    It should have been under-
stood by plaintiff and doubtless was.    The clear preponder-
ance of the evidence shows that she, though aged, was a bright,
intelligent woman and well able to attend to her business.
She read the contract and had ample time to examine it.
There was nothing complicated about this provision.    Any
person of the intelligence of plaintiff would understand it
upon the most casual reading, and it is not the policy of the
law to permit a person capable of understanding a contract to
sign it, retain it, and afterwards avoid it upon such pretext.

*Bostwick v. Mut. L. Ins. Co.* 116 Wis. 392, 89 N. W. 538, 92 N. W. 246; *Kruse v. Koelzer,* 124 Wis. 536, 102 N. W. 1072.

Some claim is made that plaintiff was not represented by an attorney in the making of the contract. She had an opportunity to select her own attorney. There was some talk as to who should draw the contract. Plaintiff said she did not know the Oshkosh lawyers except Mr. Hilton, and she did not want him because she was displeased with his action in not voting the Edmundson stock for defendant at the directors' meeting, and finally it was agreed that Judge Bullard, of Menasha, should draw the contract, which he did. The defendant saw Bullard, gave him the facts relating to the deal, and Bullard drew the contract, presented it to the plaintiff on Monday, August 4, 1913, gave her a copy which she read, and Bullard also read it to her. · There was a blank left in the contract for the amount of the purchase price to be inserted, also a blank for the rate of interest. Plaintiff said she wanted six per cent. interest and it was put in. Also the purchase price, $25,000, was inserted with her consent. The matter was permitted to stand over until the next day, when Mr. Bullard was at Oshkosh and the plaintiff went to the bank, got her papers, and went to the Oshkosh Savings & Trust Company office, met Mr. Bullard, and delivered the stock to said company in compliance with the contract.

It is admitted by counsel for respondent that Judge Bullard is an honest man. He is a reputable attorney in good standing in the state. The evidence shows that he acted with the utmost fairness in the matter and gave the plaintiff opportunity to carefully examine the contract and deliberate upon it before the deal was closed. It appears from the testimony of Judge Bullard that the plaintiff is a bright, capable, comprehending woman and well understood the contract she was signing; that he was somewhat acquainted with her, having

met her before on different occasions when he was county judge.

Nothing further was heard from plaintiff in the matter until about twenty days after the making of the contract, and she then wrote several letters to defendant asking him to return her stock. Her letters upon this subject were put in evidence and no claim is made in them that she did not understand the contract.

As regards the price, there can be no question. It is established that a blank was left for plaintiff to insert the amount she wished. She knew defendant would pay $30,000 for the stock if she demanded it, but she concluded to sell it for par, what she paid for it, with interest at six per cent. until paid. Whether the stock will appreciate or depreciate depends upon management and the success of the company. It is matter of common knowledge and is clear from the record that the success of the company depends largely upon management. There is no doubt but that defendant believed the company would not be successful under the new directorate. It would seem that Wagg and Freeman shared in this belief because they disposed of their stock except a few shares, and were doubtless more interested in managing the business at good salaries than in owning stock.

Counsel refer to the brilliant success of Wagg and Freeman in the management of the business. It is doubtful whether the record will support this claim. The defendant while director accepted no salary. He was interested in the success of the company only.

We have examined with care the voluminous record in the case. We have been favored by counsel on both sides with able and exhaustive briefs, which we have found very helpful. We are convinced that no case was made against the defendant.

There is no evidence in the record sufficient to support the

findings and conclusions of the court below. *Boardman v. Lorentzen,* 155 Wis. 566, 145 N. W. 750. On the contrary, the clear preponderance of the evidence shows that in the purchase of the stock in question the defendant dealt fairly and honestly with plaintiff and was guilty of no overreaching, unfair, or unconscionable conduct.

*By the Court.*—The judgment of the court below is reversed, and the cause remanded with instructions to dismiss the complaint.